# 14-2949-CV

## United States Court of Appeals

*for the*

## Second Circuit

BOIES, SCHILLER & FLEXNER LLP,

*Appellant,*

MADISON 92ND STREET ASSOCIATES, LLC,

*Plaintiff,*

– v. –

HOST HOTELS & RESORTS, INC.,

*Defendant-Appellee,*

MARRIOTT INTERNATIONAL, INC., DIAMONDROCK HOSPITALITY CO., NEW YORK HOTEL & MOTEL TRADES COUNCIL, AFL-CIO, COURTYARD MANAGEMENT CORPORATION,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR APPELLANT
## (REDACTED VERSION)

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

– and –

LAW OFFICES OF MICHAEL S. ROSS
60 East 42nd Street, 47th Floor
New York, New York 10165
(212) 505-5200

*Attorneys for Appellant*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED ...........................................................................1

PRELIMINARY STATEMENT .............................................................2

STATEMENT OF THE CASE ...............................................................5

STATEMENT OF FACTS .....................................................................8

   A.  BSF's Representation of Host in 2000-02 ..............................8

   B.  BSF's Representation of Madison in 2012-13 ......................9

   C.  Host's Allegation of a Conflict.............................................11

   D.  BSF's Immediate Good Faith Efforts to Evaluate Host's Allegation of a Conflict ......................................................12

   E.  BSF's Repeated Requests for Host to Explain Specifics of the Alleged Conflict..........................................................15

   F.  BSF's Immediate Withdrawal After Host Specifically Identified a Conflict ...........................................................24

SUMMARY OF ARGUMENT ..............................................................29

STANDARD OF REVIEW ...................................................................30

ARGUMENT ........................................................................................31

   I.  THE SANCTIONS ORDER MUST BE REVERSED BECAUSE THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD .........................................................31

     A.  Sanctions Must Be Based on Specific Findings of Bad Faith Where the Challenged Conduct Is Entirely Without Color and Motivated by Improper Purposes ............................................................31

     B.  The District Court Applied the Wrong Standard in Imposing Sanctions....................................................35

II.  APPLYING THE PROPER LEGAL STANDARD, THERE IS
      NO BASIS FOR SANCTIONS ................................................................40

     A.  BSF's Good Faith in Addressing the Substantial Relationship
         Test Precludes a Finding of Bad Faith ......................................41

     B.  The Evidence before the District Court Shows that BSF's
         Actions Were Colorable ...............................................................45

     C.  There Is No Evidence of an Improper Purpose .......................53

CONCLUSION .........................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
607 F.3d 817 (Fed. Cir. 2010) ...............................................................40

*Black v. Schwartz*,
No. 09-CV-2271, 2012 WL 4086775 (E.D.N.Y. Sept. 17, 2012) .......................44

*Cinema 5 Ltd. v. Cinerama, Inc.*,
528 F.2d 1384 (2d Cir. 1976) ...............................................................56

*Claiborne v. Wisdom*,
414 F.3d 715 (7th Cir. 2005) ...............................................................37

*Commercial Recovery Corp. v. Bilateral Credit Corp. LLC*,
No. 12 Civ. 5287(CM), 2013 WL 8350184 (S.D.N.Y. Dec. 19, 2013) ...........5, 40

*Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*,
782 F.2d 329 (2d Cir. 1986) ...............................................................32

*Eisemann v. Greene*,
204 F.3d 393 (2d Cir. 2000) ........................................... 32, 33, 35, 40

*Enmon v. Prospect Capital Corp.*,
675 F.3d 138 (2d Cir. 2012) ........................................... 30, 32-35, 53

*Glueck v. Jonathan Logan, Inc.*,
653 F.2d 746 (2d Cir. 1981) ...............................................................56

*GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*,
618 F.3d 204 (2d Cir. 2010) ...............................................................56

*In re Pennie & Edmonds LLP*,
323 F.3d 86 (2d Cir. 2003) ...............................................................43

*Life Fitness, Inc. v. Sears, Roebuck & Co.*,
No. 88 C 263, 1988 WL 37835 (N.D. Ill. Apr. 21, 1988) ................ 37, 38, 55, 56

*MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*,
73 F.3d 1253 (2d Cir. 1996) ........................................................ 35, 37

*Mackler Prods., Inc. v. Cohen*,
   225 F.3d 136 (2d Cir. 2000) .................................................................5

*Milltex Indus. Corp. v. Jacquard Lace Co.*,
   55 F.3d 34 (2d Cir. 1995) .................................................................32

*Muhammad v. Walmart Stores East, L.P.*,
   732 F.3d 104 (2d Cir. 2013) .............................................................43

*Murray v. Metro. Life Ins. Co.*,
   583 F.3d 173 (2d Cir. 2009) .............................................................42

*Oliveri v. Thomspon*,
   803 F.2d 1265 (2d Cir. 1986) ...........................................................33

*Pescatore v. Pan Am. World Airways, Inc.*,
   97 F.3d 1 (2d Cir. 1996) ...................................................................5

*Schlaifer Nance & Co. v. Estate of Warhol*,
   194 F.3d 323 (2d Cir. 1999) ....................................................... *passim*

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
   490 F.3d 130 (2d Cir. 2007) ..............................................................5

*Ted Lapidus, S.A. v. Vann*,
   112 F.3d 91 (2d Cir. 1997) ...............................................................38

*THOIP v. Walt Disney Co.*,
   No. 08 Civ. 6823 (SAS), 2009 WL 125074 (S.D.N.Y. Jan. 20, 2009) ......... 38, 56

*United States v. Binday*,
   No. 12 Cr. 152 (CM), 2013 WL 1104258 (S.D.N.Y. Mar. 14, 2013)...................6

*United States v. Int'l Bhd. of Teamsters*,
   948 F.2d 1338 (2d Cir. 1991) ...........................................................38

*United States v. Seltzer*,
   227 F.3d 36 (2d Cir. 2000) ...............................................................31

*Wolters Kluwer Fin. Servs, Inc.. v. Scivantage*,
   564 F.3d 110 (2d Cir. 2009) .......................................29-32, 35, 45, 53

iv

**<u>Statutes</u>**

28 U.S.C. § 1927 ............................................................................. *passim*

**<u>Other Authorities</u>**

Richard E. Flamm,
  <u>Lawyer Disqualification, Disqualification of Attorneys and Law Firms</u>
  (2d ed. 2014) .......................................................................................42

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the underlying action that led to this appeal, *Madison 92nd Street Associates, LLC v. Marriott International, Inc., et. al.* (which is itself on appeal, Nos. 14-2947 and 14-2954),[1] under 28 U.S.C. §§ 1331, 1337(a), 1367 and 18 U.S.C. § 1964(a).  Final judgment disposing of all claims in the underlying action was entered on July 28, 2014, and a supplemental final judgment imposing sanctions on Boies, Schiller & Flexner LLP ("BSF" or the "Firm") was entered on August 11, 2014.  (Special Appendix ("SPA") 60.)  BSF's Notice of Appeal was filed on August 18, 2014.  (Joint Appendix ("A") 574.)  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court applied an erroneous legal standard in imposing sanctions and awarding attorneys' fees against non-party Appellant Boies, Schiller & Flexner LLP pursuant to 28 U.S.C. § 1927 and the inherent power of the court, without having made factual findings, with a high degree of specificity, that there was clear evidence that BSF acted in bad faith, that its conduct was not colorable, and that it was motivated by improper purposes for

---

[1] The plaintiff in the underlying action, represented by new counsel, is appealing dismissal of its amended complaint.  This Court has severed the plaintiff's appeals (Nos. 14-2947 and 14-2954) from the instant appeal (No. 14-2949).

1

having delayed withdrawing as counsel for the plaintiff in an action against BSF's former client, Defendant-Appellee Host Hotels & Resorts, Inc. ("Host").

2.    Whether the evidence supported imposition of sanctions against BSF under the applicable bad faith standard.

## PRELIMINARY STATEMENT

The firm of Boies, Schiller & Flexner LLP represented Plaintiff Madison 92nd Street Associates, LLC ("Madison") in the underlying litigation (the "*Madison* litigation").  BSF withdrew from that representation immediately after recognizing that a conflict of interest arose from its prior representation of Defendant-Appellee Host Hotels & Resorts, Inc. ("Host") a decade earlier.  BSF appeals from a decision by Judge Colleen McMahon in the Southern District of New York awarding sanctions against BSF for the Firm's purported failure to withdraw in a timely manner.

*First*, the district court applied the wrong legal standard in imposing sanctions and awarding attorneys' fees against BSF pursuant to 28 U.S.C. §1927 and the inherent power of the court.  Application of the correct standard would have required factual findings, made with a high degree of specificity, that BSF had acted in subjective bad faith and that its conduct in representing Madison was entirely baseless and motivated by improper purposes.  Instead, the district court

2

applied a negligence standard, finding only that BSF had acted in an objectively unreasonable manner under the circumstances.

*Second*, the record cannot support a sanctions judgment based upon the requisite finding of bad faith. To the contrary, BSF at all times acted in good faith by treating Host's assertion of a conflict with utmost seriousness from the outset and investigating it at length by, among other things, immediately retaining and working diligently with highly respected outside ethics counsel, who directed the Firm's inquiry and opined that there was no conflict; repeatedly asking Host for the factual basis of the asserted conflict (including in a conference call in which BSF laid out its reasons for believing that there was no "substantial relationship" between the two allegedly conflicting representations), which Host was unwilling or unable to provide for many weeks; and immediately withdrawing when Host's counsel finally identified portions of two documents from BSF's file for Host's representation (which comprised 39 boxes or approximately 100,000 pages) that identified a conflict—albeit on a theory and in a context that had never previously been raised.

Although the conflict is apparent in hindsight, as is clear from the Firm's voluntary withdrawal, the applicable standard is subjective bad faith, not objective unreasonableness. The actual conflict upon which Host's motion and the orders below were based (namely, that BSF had given Host advice in 2002 that was

3

inconsistent with allegations in the *Madison* complaint a decade later) was different in kind from the conflict that Host had asserted in all prior discussions (namely, that BSF might use Host's confidences to benefit its new client). No findings of bad faith can be made based on the evidence.

Finally, BSF does not dispute that, in light of the allegations in the *Madison* litigation, its prior work disqualifies it, and the Firm regrets that it did not identify the conflict sooner. While we recognize that error, the award of sanctions was legally and factually unsupportable. Indeed, the district court's opinion belies the exercise of independent, dispassionate judgment that should be the hallmark of judicial condemnation in the form of sanctions. The opinion repeatedly uses intemperate language, and whole paragraphs of the court's legal analysis are literally cut and pasted verbatim from Host's moving brief.[2] Indeed, the heading for the legal analysis section of the opinion reads (just as in Host's brief) "**ARGUMENT**." (SPA-19.) And like Host's brief, the opinion ignores the

---

[2] *Compare* Sanctions Order at SPA-19-23 *with* Host's Memorandum of Law in Support of Motion for Sanctions (Dkt. no. 39, Mar. 21, 2013) ("Host Sanctions Br.") at 22-23, 24-27; *see also* Sanctions Order at SPA-3-7 and Host Sanctions Br. at 12-16.

governing legal standard that this Court has repeatedly applied.[3]  The sanctions award is not supported by the law or the facts, and should be reversed.[4]

## STATEMENT OF THE CASE

Non-party BSF represented the plaintiff, Madison, in filing the initial complaint in *Madison 92nd Street Associates, LLC v. Marriott International, Inc., et al.*, No. 13-CV-291 (S.D.N.Y.) (McMahon, J.) (the "*Madison* litigation"), an action to recover damages against defendants Marriott International, Inc. ("Marriott"), Host, DiamondRock Hospitality Co. ("DiamondRock"), and New York Hotel & Motel Trades Council, AFL-CIO (the "Union").

The *Madison* complaint alleged a fraudulent scheme and anticompetitive conspiracy among the defendants to reduce competition in the New York City hotel market by allowing unionization at hotels owned by Madison and others (thereby increasing their costs), while maintaining Marriott's high-end properties as non-union.

---

[3] The district court ignored the bad faith standard here, even though it applied the correct standard two months later in denying a motion for sanctions in another case.  *See Commercial Recovery Corp. v. Bilateral Credit Corp. LLC*, No. 12 Civ. 5287(CM), 2013 WL 8350184 at *6 (S.D.N.Y. Dec. 19, 2013) (McMahon, J.).

[4] BSF respectfully requests that if there were to be a remand—which we think is unnecessary because bad faith cannot be shown—it should be to a different judge. *See, e.g.*, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 142 (2d Cir. 2007); *Mackler Prods., Inc. v. Cohen,* 225 F.3d 136, 146-47 (2d Cir. 2000); *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 21 (2d Cir. 1996).

Prior to filing the *Madison* complaint, BSF sent a draft copy to Marriott, which forwarded it to Host. On December 4, 2012, Host's General Counsel informed BSF that, in Host's view, BSF had a disqualifying conflict of interest because BSF had represented Host over a decade earlier in negotiations with Marriott during the time period addressed in the draft complaint.

BSF immediately took extensive, good faith steps to investigate the conflict asserted by Host. BSF retained as ethics counsel Michael Ross, one of the leading practitioners in that field. *See, e.g.*, *United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 1104258, at *1 (S.D.N.Y. Mar. 14, 2013) (McMahon, J.) (describing Mr. Ross as "a recognized ethics expert"). BSF also sought an explanation of the asserted conflict from its former client. In response, Host made general statements that BSF had access to confidential Host information which BSF might use against Host in the *Madison* litigation. Because Mr. Ross and the Firm did not believe that this showed that the *Madison* litigation was substantially related to the prior Host representation, they repeatedly asked Host (whose General Counsel had worked closely with BSF during the prior representation) to identify specifically the source and nature of the conflict, but Host declined to do so. BSF continued in good faith to address Host's expressed concerns with substantial effort by, among other things, interviewing lawyers who had worked on the Host representation and

6

retrieving and reviewing time records and electronic files that it also provided to Host's counsel.

At a meeting on February 22, 2013, Host's counsel identified, for the first time, portions of two documents (consisting of several sentences in a ████ ████████ and a letter signed by Host's General Counsel) which indicated that representing Madison would require BSF potentially to take positions inconsistent with advice that it had given to Host a decade earlier.

Less than twenty-four hours later, BSF informed Host that BSF would withdraw voluntarily.  The district court granted leave to withdraw on March 8, 2013.

On March 21, 2013, Host filed a motion for sanctions pursuant to 28 U.S.C. §1927 and the inherent power of the court, alleging that BSF had failed to withdraw in a timely manner.  By Decision and Order dated October 16, 2013 (the "Sanctions Order"), the district court granted Host's motion, with the amount to be determined later as measured by attorneys' fees and expenses incurred by Host after December 18, 2012.  (SPA-26.)

The district court denied BSF's motion for reconsideration of the Sanctions Order (the "Reconsideration Order") on November 6, 2013.  (SPA-56.)

After entering judgment dismissing the underlying *Madison* case in July 2014, the district court quantified the amount of sanctions awarded to Host against

BSF at $271,063.21 (Host had sought $412,343.90 in fees and expenses).[5] (SPA-58; A-570.)  A supplemental judgment for this amount was entered on August 11, 2014.  (SPA-60.)

## STATEMENT OF FACTS

### A.    BSF's Representation of Host in 2000-02

In July 2000, Host retained BSF to represent it in connection with a review of Host's relationship with Marriott.  (Joint Confidential Appendix ("CA") 62, ¶5.) Host is the owner of hotels in the United States and abroad, and it enters into management agreements with independent third parties to manage its properties. One of those management companies is Marriott.  ███████████████

█████████████████████████████████████████████████

███

        █████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

██████████████████████     In 2002, BSF also assisted in a global settlement that

included new and amended agreements governing the relationship between Host

---

[5]  Over 47 percent of the fees for which Host sought reimbursement were incurred by its lawyers after BSF notified Host that it would withdraw from representing Madison.  (*See* A-564-70 (Host incurred a total of $209,000 in fees between December 18, 2013 and February 23, 2013 and $189,000 in fees thereafter).)

and Marriott, as well as agreements relating to Host's New York City hotels.  (*Id.*)

██████████████████████████████████████████████

██████████████████████████████████████████

████████████

After Host settled with Marriott, BSF continued to perform some work for Host (CA-63, ¶7.)  BSF last billed Host in early 2005, and did not thereafter advise or represent Host.  (CA-8, ¶8.)

### B.    BSF's Representation of Madison in 2012-13

Over ten years after the Marriott settlement, Madison approached BSF concerning possible representation in a new matter adverse to Host.  (CA-64-65, ¶11.)  Madison asked BSF to appear as new counsel for Madison in a lawsuit then pending in New York Supreme Court against Courtyard Management Corporation ("Courtyard"), a Marriott subsidiary (and in which Host was not a defendant) (the "State Court Action"), and to bring federal litigation against Marriott, Host, DiamondRock (another hotel company that has relationships with Marriott), and labor unions.  (*Id.*)

The complaint in the State Court Action, which was filed by another firm, alleged that Madison was induced to contract with Courtyard to manage Madison's hotel at 92nd Street and First Avenue (the "92nd Street Hotel"), in part by representations to Madison that the 92nd Street Hotel's work force would not be

unionized, which Courtyard allegedly knew to be false.  (CA-65, ¶12.)  The complaint also asserted that until 2009, Courtyard had concealed from Madison the extent of worker unionization at the 92nd Street Hotel and the adverse financial impact this was having on Madison's investment.  (*Id.*)

Before BSF agreed to represent Madison, BSF's General Counsel, Nicholas A. Gravante, Jr., directed performance of a conflicts check, which showed that Host formerly had been a client of the Firm.  (CA-66, ¶13.)  Mr. Gravante then made inquiries within BSF and learned that the prior representation involved Marriott's management of Host's hotel properties.  (*Id.*)  Mr. Gravante understood that although Host was a former client of BSF, Rule 1.9 of the New York Rules of Professional Conduct permits a firm to take on matters adverse to a former client, unless the new representation is the same or substantially related to the former representation.  (*Id.*)  Mr. Gravante did not have reason to believe that BSF's former representation of Host involved claims of a labor conspiracy (*i.e.*, the subject matter of the proposed Madison engagement)[6] and he concluded that the new matter was not substantially related to the former matter.  (*Id.*)

---

[6] The district court sharply criticized BSF, saying it was "absurd" to argue that a search of the firm's electronic files "did not turn up any references to a 'labor conspiracy'."  (SPA 12.)  The district court stated, "I would be shocked to learn that an attorney employed by BSF would have written a diary entry indicating that he or she was advising a client about entering into a 'labor conspiracy.'  (SPA 12, n.3.)  This criticism is unwarranted.  As a reading of BSF's entire brief in the

BSF was formally retained by Madison on October 1, 2012. (CA-66-67, ¶14.) BSF drafted a complaint to be filed in the Southern District of New York, asserting antitrust and civil racketeering claims against Marriott, Host, DiamondRock, and the Union. On November 28, 2012, BSF sent a draft of the complaint to counsel for Marriott in the State Court Action. (*Id.*)

### C.    Host's Allegation of a Conflict

On December 4, 2012, Elizabeth Abdoo, Host's General Counsel, called Roseanne Baxter, one of the BSF attorneys who had worked on the prior representation, and stated that Marriott had sent her a copy of the draft complaint. (CA-67, ¶15.) Ms. Abdoo expressed concern that BSF had previously represented Host and that the draft complaint alleged that Host and Marriott had engaged in a labor conspiracy involving the 92nd Street Hotel. (*Id.*) Despite her personal involvement in BSF's prior representation of Host, Ms. Abdoo did not assert that the new matter was the same or substantially related to the prior representation, nor did she point to specific information in the draft complaint that was derived from

---

district court, as well as the supporting declaration of Magda Jimenez Train, shows that the phrases "labor conspiracy" and "labor-related conspiracy," in context, are being used as a shorthand reference to the subject matter of BSF's engagement by Madison: an alleged anticompetitive scheme or conspiracy to reduce competition from certain non-union hotels in the New York City hotel market by unionizing their employees and thereby raising their costs. *See, e.g.*, BSF Opp'n Mem. (Apr. 18. 2013, Dkt. No. 52) at 3-5, 7, 9, 12-13, 20, 24, 32; CA-63-64, 66, 68-69, 72-73, 76-77, 78, 83. The district court plainly erred in adopting a distorted interpretation of these shorthand phrases.

the prior representation. (*Id.*) Ms. Baxter advised Ms. Abdoo that she was not familiar with the draft complaint and would get back to her. (*Id.*)

Later that day, Ms. Abdoo sent Ms. Baxter an email stating that "Boies Schiller represented Host in its dealings with Marriott International during the relevant period of time mentioned in the draft complaint." (A-384; CA-67-68, ¶16.) Ms. Baxter advised Mr. Gravante and Magda Jimenez Train, BSF's Deputy General Counsel, of Host's objection to BSF's representation of Madison. (CA-67-68, ¶16.)

### D.    BSF's Immediate Good Faith Efforts to Evaluate Host's Allegation of a Conflict

That same day, December 4, 2012, Mr. Gravante spoke with Ms. Jimenez Train and asked her to investigate the issue further. (CA-68, ¶17.) Ms. Jimenez Train began to gather the facts. Mr. Gravante also made arrangements to seek advice from Michael S. Ross, BSF's outside ethics counsel. (*Id.*)

On December 5, 2012, Ms. Jimenez Train, along with Mr. Gravante and a BSF partner involved in the new *Madison* matter, participated in a conference call with Mr. Ross. (CA-68, ¶18.) Mr. Gravante asked Mr. Ross to review the conflict issue and instructed him to analyze the facts and law and to determine the proper ethical result. (CA-68-69, ¶19.)

During the conference call, the BSF attorneys discussed the draft complaint with Mr. Ross and focused on the core allegations: *i.e.*, an alleged fraudulent

12

scheme and anti-competitive conspiracy among Marriott, Host, DiamondRock and the Union to reduce competition in the New York City hotel market by enabling unionization to occur at Madison's 92nd Street Hotel and other previously non-unionized hotels, thereby increasing their costs, while allowing Marriott's high-end hotel properties to remain non-union.  (CA-68, ¶18.)  Mr. Ross reviewed with the BSF lawyers the scope of the two engagements.  (CA-68-69, ¶19.)  He also reviewed the language of Rule 1.9, which permits a firm to be adverse to a former client, so long as the new matter is not the same or substantially related to the former representation.  Despite Mr. Ross's assessment that BSF was in compliance with Rule 1.9, because it did not appear that the labor conspiracy alleged in the *Madison* litigation was substantially related to the prior advice involving Marriott's management of Host's hotels, Mr. Gravante asked Mr. Ross to conduct a further analysis to determine if there was any conflict based on Host's expressed concerns. (*Id.*)

BSF's conflict inquiry was directed by Mr. Ross, as BSF's outside ethics counsel, and its parameters were defined by Mr. Ross.  (A-551, ¶8.)  Mr. Ross believed that BSF provided him with all available documents and information that either BSF or Mr. Ross considered relevant.  (A-551, ¶7.)  At no time did BSF mislead or misinform, or attempt to mislead or misinform, Mr. Ross about the nature or scope of BSF's prior presentation of Host.  (A-551-552, 558, ¶¶7, 9, 23.)

The next day, December 6, 2012, Ms. Jimenez Train met with Mr. Ross and Mr. Ross's associate, James D. Liss (who has 30 years of experience in the field of attorney ethics) to evaluate whether BSF could continue to represent Madison and whether there was a "substantial relationship" between the two representations. (CA-69, ¶20.)  They interviewed Ms. Baxter to understand the nature of BSF's prior representation.  (*Id.*)

Ms. Baxter indicated that BSF's prior engagement by Host related to unfair financial treatment of Host by Marriott; and that the prior engagement did not involve BSF in addressing labor or union issues.  (CA-69-70, ¶21.)  After the interview, Mr. Ross advised that this information confirmed his view that there was no substantial relationship between the two representations.  In addition, he advised that the interview had confirmed his belief that BSF was not disqualified based upon any "playbook" information that might have been obtained in representing Host.  (*Id.*)[7]

Although Mr. Ross's preliminary view was that no conflict existed (CA-70, ¶23), he nonetheless recommended that:  (i) BSF retrieve the billing records for its

_____

[7] A "playbook" conflict describes the situation where a lawyer has obtained information about a former client's general approach to certain types of issues, such as the former client's approach to bargaining in settlement discussions or willingness to be deposed by an adversary, and may use this information to the disadvantage of the former client.  (CA-78, ¶44; CA-69, ¶21.)

14

representation of Host; and (ii) conduct a search of BSF's electronic case files. (CA-70, ¶22.) Mr. Ross and Ms. Jimenez Train jointly reached the conclusion that resolution of the substantial relationship question would depend on whether BSF's representation of Host had included labor relations, union, and/or collective bargaining issues or concerns. (CA-68-69, 72-74,76-78, 83, ¶¶18-19, 29-30, 34-35, 41, 43-44, 57.) Mr. Ross provided Ms. Jimenez Train with the following search terms to apply to BSF's billing and electronic records: "union," "labor," "collective," "bargaining," and "employees." (CA-70,72-73, ¶¶22, 29-30.)

### E.  BSF's Repeated Requests for Host to Explain Specifics of the Alleged Conflict

Mr. Ross further advised Ms. Jimenez Train that it would be helpful to understand why Ms. Abdoo, Host's General Counsel, believed that there was a conflict. (CA-70-71, ¶24.) On Saturday, December 8, 2012, with the approval of Mr. Ross, Ms. Jimenez Train sent an email to Ms. Abdoo stating:

> I am writing to let you know that we are in receipt of your email to Roseanne Baxter dated December 4, 2012. We are in the process of analyzing the issue and are consulting with outside ethics counsel. Based on our investigation thus far, we do not have any reason to believe that the potential lawsuit by Madison 92nd Associates referenced in your email is the same or substantially related to any matter in which we previously represented Host, and therefore, there is no actual or potential conflict. If you have any basis to believe otherwise, please let us know as soon as possible. I can be reached at the number below.

(A-387; CA-70-71, ¶24.) Ms. Abdoo responded that same day: "I strongly disagree with the firm's position. I would suggest that we speak on Monday. I am

15

available after 3 pm.  Please let me know what time would be convenient."  (A-378; CA-71, ¶25.)

Ms. Jimenez Train welcomed the opportunity to have this dialogue with Ms. Abdoo.  (CA-71, ¶26.)  Ms. Jimenez Train and Ms. Abdoo exchanged emails and set a call for Tuesday, December 11.  (A-386-87; CA-71, ¶26.)  This email correspondence plainly evinces Ms. Jimenez Train's willingness and sincerity in seeking to understand the nature of the asserted conflict.  The evening before they were scheduled to speak, however, Ms. Abdoo sent an email cancelling the call:  "I apologize but I am no longer available to speak tomorrow afternoon."  (A-386; CA-71, ¶27.)

After not hearing anything further, Ms. Jimenez Train emailed Ms. Abdoo on December 12, 2012, attempting to reschedule their call to determine the basis for the conflict claim:

> We would like to better understand why you believe there is a conflict under the circumstances.  As I stated in my previous email, we have been examining this issue and do not have any reason to believe that the potential lawsuit by Madison 92nd Associates is the same or substantially related to any matter in which we previously represented Host.

(A-386; CA-72, ¶28.)  Ms. Abdoo did not reply to this email.

By December 12, 2012, Ms. Jimenez Train had advised Mr. Ross that the search of BSF's electronic billing records and electronic files relating to representation of Host did not contain any references to a labor conspiracy.  (CA-

16

72, ¶29.)  Mr. Ross provided BSF with a draft five-page single-spaced memorandum, stating that he had tentatively concluded that there was no substantial relationship between BSF's prior representation of Host and its representation of Madison.  (*Id.*)  The principal reason was that the Host representation did not involve labor relations issues, which were the subject of BSF's representation of Madison.  (*Id.*)

Mr. Ross wrote that his conclusion was supported by other considerations, including that (i) BSF's search of its billing entries against a list of key labor-related search terms did not reveal any references relevant to the Madison representation; and (ii) BSF's search term review of its electronic files confirmed that its prior representation of Host did not concern labor relations issues.  (CA-72-73, ¶30.)

Mr. Ross's memorandum noted that BSF had asked Ms. Abdoo for a "reason" for Host's claim that there was a conflict; and Ms. Abdoo had replied only that she disagreed with BSF's position that there was no conflict, but provided no further explanation.  (CA-73, ¶31.)  Mr. Ross's memorandum stated that further information from Ms. Abdoo could change his opinion.  (*Id.*)

That same day, December 12, 2012, after Mr. Ross had sent his draft memorandum to BSF, Ms. Jimenez Train received a letter by email from J. Charles Mokriski of Proskauer Rose LLP, advising her that Proskauer had been retained by

17

Host.  (CA-73, ¶32; A-392-95.)  The focus of Mr. Mokriski's letter was that BSF had "access to . . . extensive non-public information about Host" (A-393-94) in the context of representation "that encompassed the time frame of the conspiracy alleged in your draft complaint" and "focused on [Host's] relationship with" Marriott.  (A-392.)  The allegations in the draft complaint "deal directly with that relationship, creating a clear conflict."  (*Id.*)  Mr. Mokriski stated that there was "no need to catalogue" the non-public information that BSF had obtained because BSF "is fully aware of the scope of its long-term engagement by Host and the confidential information to which it was made privy."  (A-394.)  Mr. Mokriski asserted that Host was under no legal obligation to identify what purportedly disqualifying information BSF had obtained.  (*Id.*)

Mr. Ross advised Ms. Jimenez Train that he did not believe Mr. Mokriski's letter provided any specific reason to justify BSF's disqualification.  (CA-73, ¶32.) Mr. Ross updated his memorandum in light of Mr. Mokriski's letter and sent BSF a nine-page, single-spaced memorandum on December 13, 2012, which further explained Mr. Ross's conclusion that BSF did not have a conflict.  (CA-74, ¶33.) Mr. Ross noted that, although that his views could change if Host provided additional factual information, Mr. Mokriski's letter did not change his opinion. (*Id.*)

18

Mr. Ross's December 13 memorandum described his understanding of the gist of the draft *Madison* complaint allegations as follows:

- Madison invested in the 92nd Street Hotel in reliance on a representation by Marriott that it was a non-union company.

- There was a "secret agreement" between Marriott and the Union that destroyed Madison's investment because the agreement led to unionization of the 92nd Street Hotel's employees.

- Marriott's and the Union's conduct as to the 92nd Street Hotel and its employees was part of a broader agreement under which the Union would not to attempt to unionize Marriott's highest class hotels in New York, in exchange for which Marriott and other companies, such as Host, would permit, and even facilitate, the Union to organize employees at Marriott's less prestigious brands, such as the 92nd Street Hotel.

(CA-74, ¶34.)  The December 13 memorandum then noted that Mr. Ross had received no information indicating that BSF's prior work for Host involved any of these issues.  (CA-74, ¶¶ 34, 35.)

Finally, Mr. Ross noted that Host would, as a legal matter, have the initial burden on a disqualification motion to present a clear factual showing that disqualification was warranted.  (CA-75, ¶36.)  He stated that the Second Circuit and the district courts had adopted a restrictive interpretation of the substantial relationship test and had frequently stated that disqualification motions are disfavored.  (*Id.*)  He concluded, and Ms. Jimenez Train agreed, that the

19

information provided by Host and its outside counsel did not satisfy the applicable standard.  (*Id.*)

Based upon Mr. Ross's analysis and BSF's understanding of the issues at the time, BSF believed, in good faith—and in light of Host's unwillingness to provide details beyond generally asserting BSF's receipt of confidential information—that its new representation of Madison did not create a conflict.  (CA-75, ¶37.) However, BSF continued to make efforts to learn why Host and Proskauer believed there was a conflict.  (*Id.*)

On December 18, 2012, Ms. Jimenez Train emailed Mr. Mokriski, continuing BSF's good-faith efforts to understand the asserted conflict.  (A-397; CA-75-76, ¶¶38, 39.)  Ms. Jimenez Train explained that Mr. Mokriski's December 12, 2012 letter did "not provide any additional facts that would lead a reasonable lawyer to conclude that BSF's prior representation of Host is the same or substantially related to a potential lawsuit concerning an alleged antitrust conspiracy between hotel owners and the local unions."  (A-397; CA-75-76, ¶38.) Mr. Jimenez Train wrote:  "Nonetheless, I would like [to] schedule a telephone conference at your convenience to discuss your concerns and your belief that these matters are 'substantially related' to better understand the conflict that you and Host believe requires us to withdraw from our representation of Madison."  (*Id.*)

20

Mr. Mokriski's email response on December 20, 2012 contained no new information, but he agreed to schedule a conference call.  (A-400-401; CA-76, ¶40.)  Mr. Mokriski broadly asserted in his email that BSF's current representation of Madison was "plainly related and adverse to [BSF's] prior engagement by Host"—but did not explain why the matters were "so plainly related."  (A-400; CA-76, ¶40.)  Mr. Mokriski repeated that BSF had been given access to confidential information in the context of representing Host and that BSF played a significant part in the agreements Host made with Marriott.  (A-401.)

After reviewing Mr. Mokriski's email, Mr. Ross continued to advise BSF that Host's vague responses to specific questions did not demonstrate an adequate basis to conclude that a substantial relationship existed.  (CA-76, ¶41.)  Ms. Jimenez Train nonetheless welcomed Mr. Mokriski's willingness to discuss the matter, because she believed that specifics might be provided.  (CA-77, ¶42.)

In December 2012 (and continuing into January 2013), Mr. Ross personally reviewed documents from BSF's representation of Host in a good faith effort to understand whether the two representations were substantially related, including documents located through the electronic search using the key terms provided by Mr. Ross.  (CA-70, 77, 79, ¶¶22, 23, 42, 46, 47.)  Ms. Jimenez Train and Mr. Ross also interviewed Andrew Hayes, a former BSF partner who had worked on the prior Host matter.  (CA-77, ¶42.)

21

With holidays intervening, the conference call with Mr. Mokriski and other Proskauer lawyers took place on December 28, 2012.  (CA-77-78, ¶43.)  During that lengthy call, Ms. Jimenez Train described BSF's due diligence in determining whether there was a conflict, and described, among other things, the search of its electronic records that BSF had undertaken.  (*Id.*)  Mr. Ross explained that he had interviewed Ms. Baxter and Mr. Hayes and had reviewed various documents.  (*Id.*)

Mr. Ross and Ms. Jimenez Train said they believed there was no conflict because, in the prior matter, BSF represented Host with respect to a dispute concerning Marriott's management of Host's hotel properties; and in the current matter, BSF was representing Madison in alleging that Host and others had engaged in a labor-related conspiracy.  (CA-78, ¶44.)  Mr. Ross also observed that he did not believe that this was a case of a "playbook" conflict of interest—a possible basis for disqualification that Host had not asserted in any event.  (*Id.*)

Notwithstanding BSF's expressed desire to understand the conflict claim, Host's attorneys did not give any explanation during the call (either before or after they went offline for a time to confer privately) as to how or why Mr. Ross and Ms. Jimenez Train were analyzing the conflict issue incorrectly, nor did they indicate that BSF's electronic file search terms were inadequate.  (CA-78-79, ¶45.)  Host's attorneys simply stated that they disagreed with BSF's position and that they would talk to their client.  (*Id.*)

22

After the December 28 conference call, Mr. Ross continued to advise BSF that his opinion had not changed.  (*Id.*)  Because Host and Proskauer refused to provide any further explanation, Ms. Jimenez Train and Mr. Ross believed that Proskauer may have been using the specter of conflict as a tactical weapon, rather than a legitimate basis to prevent harm or prejudice to Host.   (CA-76, ¶41.)

In response to Proskauer's request and in good faith, on January 4, 2013, BSF began production to Proskauer of BSF's files relating to the representation of Host.  (CA-79, ¶46.)  BSF made responsible and timely efforts to collect, review, and produce Host's records.  (CA-79-80, ¶47.)   Mr. Ross, who also reviewed time records and documents, continued during January to advise BSF that, in his view, there was no conflict.  (CA-79, ¶46.)  As Ms. Jimenez Train expressed in an email to Proskauer on January 10, 2013, responding to a complaint on that she was unduly delaying the production:

> Needless to say, I object to the characterizations and accusatory tone of your [January 9, 2013] email. You are correct that on December 12, Proskauer requested that we send Host its file, along with various other demands and allegations.  Yesterday was only January 9, so it has not yet been a month and there are various reasons why the request could not be immediately complied with.  First, since December 12, there have been 15 business days, and as I have previously told you I was out of the office and out of town for a week during that period for the Christmas holiday.  Second, when we received the letter on December 12th our top priority was to determine whether there was any merit to the allegations in that letter, and whether there was any legal basis to withdraw from our representation of Madison 92nd Street Associates.  As you should be aware by now I did not work on the Host matter, and in my role as Deputy General Counsel, I had to gather information and documents, interview attorneys and consult with our outside

23

ethics counsel about the issues raised in the December 12 letter.  We have not represented Host in many years, and the files are not easily accessible.  Since the time that the firm represented Host, the firm has changed billing databases and has updated its technology in various ways that makes accessing the files burdensome and time-consuming.  Third, the December 12 letter implicitly threatens to bring litigation against BSF by demanding a 'litigation hold', making our assembly of the file and our substantive review of the file that much more important and a task that requires enhanced care and attention by me personally and our outside ethics counsel.

I repeat that we have taken, and continue to take, Host's allegations and its requests very seriously.  We are certainly using best efforts to comply with Host's request that we return its file promptly. But as I am sure you are aware, 20-30 boxes can not be retrieved from archives, reviewed and copied as quickly as your email suggests.  Therefore, we need time to review and copy the remaining documents . . . .

(A-403; CA-79-80, ¶47.)

BSF produced additional documents to Host on January 15, 18, 22 and completed production of a total of 39 boxes on February 12, 2013.  (CA-80, ¶48.) Host and Proskauer still had given no explanation of the specific basis for Host's claimed conflict.  (*Id.*)  On January 13, 2013, BSF filed Madison's complaint in federal court (A-71); it was substantially the same as the draft that Host had seen in early December.

### F.    BSF's Immediate Withdrawal After Host Specifically Identified a Conflict

On February 15, 2013, Proskauer contacted Ms. Jimenez Train to set up a meeting.  (A-407-08.)   By this time, Proskauer already had billed well over a hundred thousand dollars in time charges for reviewing documents and drafting Host's disqualification motion.  (A-207, ¶18; A-565-66.)  On February 22, 2013,

24

Ms. Jimenez Train, Mr. Ross and Mr. Liss met with Proskauer attorneys.  (CA-80, ¶49.)

At the February 22 meeting, the Proskauer lawyers identified, for the first time, two specific documents which established that a conflict existed.  These documents had been included in BSF's initial production of approximately five boxes on January 4, over six weeks earlier.  (*Id.*)  As review of the two documents shows, ███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████

The first document ███████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

The second document is a November 26, 2002 letter signed by Ms. Abdoo to the law firm of Grant & Eisenhofer, which had threatened to bring a shareholder derivative action based upon Host's settlement with Marriott.  (CA-81, ¶51; A-239.)  BSF had assisted in drafting the letter (CA-81, ¶51), which stated:  "Those new agreements, together with renegotiated corporate-level agreements between Host and [Marriott], favorably resolved substantially all the concerns discovered by Host's investigation, and provided a meaningful positive benefit to Host, in both the immediate and in the long term." (A-240.)

Proskauer viewed that these statements were inconsistent with allegations in paragraphs 60 through 66 of BSF's complaint in the *Madison* case.  (CA-81-82, ¶52.)  Those paragraphs alleged that Host could not have acted in its self-interest in "contracting with [Marriott] to manage newly acquired properties, and abstaining from acquiring properties managed by Marriott's competitors," unless it was for the purpose of effectuating a secret labor conspiracy.  (A-35-36, ¶65; CA-81-82, ¶52.)  Ms. Jimenez Train and Mr. Ross responded that they would review the documents carefully and consider the matter.  Proskauer gave BSF until the close

of business on Monday, February 25, 2013 to advise that it would withdraw from representing Madison, or Proskauer would file its already-prepared motion to disqualify.  (CA-81-82, ¶52.)

Ms. Jimenez Train, Mr. Ross and Mr. Liss further reviewed the two documents immediately thereafter.  (CA-82, ¶53.)  They spoke to the BSF partner involved in drafting the *Madison* complaint in order to obtain a better understanding of paragraphs 60 through 66.  (*Id.*)

The complaint described the alleged conspiracy between Host and Marriott as follows, with no mention of the fact that Host and Marriott entered into a settlement agreement in 2002:

- The complaint alleged Host's desire to gain an economic advantage by ensuring that workers at its hotels would not be unionized; and that Host accomplished this by entering into a conspiracy with Marriott to manage Host's hotels in exchange for Marriott's assistance in convincing the Union to refrain from organizing certain Host hotels (A-34-36, ¶¶60-66);

- Absent such a conspiracy, Host would not have had a legitimate reason to retain Marriott to manage its hotels (A-35-36, ¶65); and

- Marriott did not have a legitimate reason to have conferred a benefit on Host because it was a rival hotel owner. (A-36, ¶ 66.)

Ms. Jimenez Train and Mr. Ross determined that BSF's continued representation of Madison would likely require BSF to attack its own work product, *i.e.*,

███████████████████████████████████████████

████████████████████████

The next day, Saturday, February 23, 2013—within 24 hours of becoming aware of the specific nature of the conflict—Mr. Ross telephoned Proskauer and advised that, effective immediately:  (i) BSF would not take any positions adverse to Host and, if necessary, would withdraw from further representation of Madison; and (ii) accordingly, there was no reason to file a motion to disqualify.  (CA-82, ¶54.)  Thereafter, BSF withdrew from both the State and Federal actions (*id.*) and Host did not file its disqualification motion.

As this sequence of events makes clear, if the Firm had understood through its investigation or otherwise—at any time from December 2012 onwards—that the two documents first identified on February 22 raised a conflict issue, it would have withdrawn immediately, as it did in fact do, without the need for a motion to disqualify or any of the other effort and expense that the parties incurred.

There is no evidence in the record as to when Ms. Abdoo or Proskauer identified the two key documents.  However, if Ms. Abdoo knew about the two documents or their substance when she first raised the conflict issue, there would be no reasonable basis for not disclosing that information at the time, and no reasonable basis to conclude that BSF would not have then withdrawn.  If, on the other hand, Ms. Abdoo did not know about the two documents or their substance

and Proskauer did not identify the documents until shortly before the meeting with BSF on February 22, there would be every reason to conclude that BSF acted in good faith in investigating a conflict claim arising from a ten-year-old representation, including not identifying or appreciating the significance of those same documents in its own review of the files. That this is the most reasonable explanation of the chain of events is confirmed by the fact that neither Proskauer's letter of December 12, the subsequent conference call on December 28, nor any communication prior to February 22, raised more than generalized claims of a conflict based on potential use of confidential Host information, while never referring to the actual conflict which led to BSF's withdrawal.

## SUMMARY OF ARGUMENT

The standard for imposing sanctions in this Circuit under both §1927 and the court's inherent power is well-established and demanding. The sanctioning court must find, with a high degree of specificity in its factual findings, clear evidence that an attorney acted in bad faith. Sanctions are only appropriate when there is clear evidence that the conduct was both without color and motivated by improper purposes. *See Wolters Kluwer Fin. Servs., Inc.. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999). The district court here, however, effectively applied a negligence standard that is flatly inconsistent with the law of the Circuit, and it made none of

the findings that are essential to impose sanctions, that is, specific findings of bad faith based on conduct having no legal or factual support and undertaken for an improper purpose.  (Point I)

Because the district court applied the wrong legal standard, its decision was an abuse of discretion.  Applying the proper standard to the evidence, a finding of bad faith cannot be sustained.  The evidence shows that BSF's conduct was taken in good faith, with colorable justification, and motivated by proper purposes. (Point II)

## STANDARD OF REVIEW

A decision imposing sanctions is reviewed for abuse of discretion.  *See Wolters Kluwer*, 564 F.3d at 113.  "The reviewing court must ensure that the district court's sanctions are not based on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Id.*[8]  This review "is more exacting than under the ordinary abuse-of-discretion standard" because "the trial court [imposing sanctions] may act as an accuser, fact finder and sentencing judge all in one."  *Enmon v. Prospect Capital Corp.,* 675 F.3d 138, 143 (2d Cir. 2012) (alteration in original).   "A district court would necessarily abuse its discretion if it

---

[8] Unless otherwise noted, throughout this Brief all emphases are added and all internal citations and quotation marks are omitted.

based its ruling on an erroneous view of the law or on a clearly erroneous

assessment of the evidence." *Schlaifer Nance*, 194 F.3d at 333.

## ARGUMENT

I.    **THE SANCTIONS ORDER MUST BE REVERSED BECAUSE THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD**

### A. Sanctions Must Be Based on Specific Findings of Bad Faith Where the Challenged Conduct Is Entirely Without Color and Motivated by Improper Purposes

"Imposition of sanctions under a court's inherent powers requires a specific

finding that an attorney acted in bad faith.  Moreover, inherent-power sanctions are

appropriate only if there is clear evidence that the conduct at issue is (1) entirely

without color and (2) motivated by improper purposes." *Wolters Kluwer*, 564 F.3d

at 114 (citing *Schlaifer Nance*, 194 F.3d at 336, 338).  "When a district court

invokes its inherent power to impose attorney's fees or to punish behavior by an

attorney in 'the actions that led to the lawsuit . . . [or] conduct of the litigation,'

which actions are taken on behalf of a client, the district court *must make an*

*explicit finding of bad faith.*" *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir.

2000) (alterations in original).[9]  This Court interprets "the bad faith standard

---

[9] The district court need not make an explicit finding of bad faith when the district court "invokes its inherent power to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit." *Seltzer*, 227 F.2d at 42.  The Sanctions Order, however, did not rely on any alleged violation of a court order by BSF or any

restrictively." *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (citing *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986)).

"Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Wolters Kluwer*, 564 F.3d at 114 (citing *Schlaifer Nance*, 194 F.3d at 337); *see Enmon*, 675 F.3d at 143 (same); *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 35 (2d Cir. 1995) ("Under standards well established by Circuit precedent, [the attorney's] conduct must have been entirely without color and motivated by improper purposes to justify the imposition of sanctions.").

In addition to these substantive requirements, "[a] finding of bad faith and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Wolters Kluwer*, 564 F.3d at 114 (citing *Schlaifer Nance*, 194 F.3d at 337); *see Eisemann*, 204 F.3d at 396. Bad faith "may be inferred *only if* actions are *so completely without merit* as to *require* the conclusion that they *must have been* undertaken for some improper purpose such as delay." *Enmon*, 675 F.3d at 143. Bad faith is "personal" and "may not automatically be visited on others." *Wolters Kluwer*, 564 F.3d at

---

conduct that was not undertaken by BSF for Madison's benefit (such as failing to return to court on time, the conduct at issue in *Seltzer*).

114.

"The showing of bad faith required to support sanctions under 28 U.S.C.

§1927 is 'similar to that necessary to invoke the court's inherent power.'" *Enmon*,

675 F.3d at 143-44 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir.

1986)).[10] Where a district court awards sanctions under both its inherent authority

and § 1927, this Court's "analysis, therefore, shall focus on the propriety of the

District Court's findings as to colorability and bad faith." *Schlaifer Nance*, 194

F.3d at 336; *see Eisemann*, 204 F.3d at 396 ("To impose sanctions under either

authority, a court must find clear evidence that (1) the offending party's claims

were entirely without color, and (2) the claims were brought in bad faith—that is,

motivated by improper purposes such as harassment or delay.").

An example of the requisite clear evidence and "particularized findings" in

holding that a firm acted "without a colorable basis" and in "bad faith" is provided

by *Enmon,* where this Court substantially upheld a sanctions award based on a law

firm's misconduct in several cases.[11] 675 F.3d at 143-44. There, the firm made a

---

[10] "In practice, 'the only meaningful difference between an award made under §
1927 and one made pursuant to the court's inherent power is . . . that awards under
§ 1927 are made only against attorneys . . . while an award made under the court's
inherent power may be made against an attorney, a party, or both." *Enmon*, 675
F.3d at 144 (first alteration in original) (quoting *Oliveri*, 803 F.2d at 1273).

[11] This Court remanded *Enmon* in part for the district court to decide whether there
should be a time limit on the requirement that the firm's attorneys attach a copy of

"misrepresentation[] by omission" by failing to disclose that there was a pending federal court action that would be enjoined by a TRO that the firm was seeking. *Id.* at 144 (alteration in original). Rather, the firm asserted that the TRO would "'do nothing but ensure the status quo is maintained,' when in fact the TRO sought to change the status quo by enjoining [the federal action]." *Id.* In another instance, the firm's opposition to confirming an arbitration award included "'frivolous arguments that misrepresented the record.'" *Id.* at 145. These misrepresentations included faulting the firm's adversary for calling witnesses out of order without disclosing that the firm had engaged in the same conduct. *Id.* This Court also found that the district court was within its discretion in awarding sanctions where a Rule 60(b) motion "as a whole contained 'persistent misrepresentations' and was made in bad faith." *Id.* at 146. Among other things, the firm omitted a "critical fact" and "falsely stated" that it discovered new evidence, when in reality it knew of that evidence for over a year. *Id.*

As is clear from the decision in *Enmon*, the nature of the firm's conduct there, such as repeated falsehoods in the underlying litigations, provided clear evidence of "detailed and particularized" actions taken "without a colorable basis." As shown in Point II below, the facts here fall far short of this exacting standard.

---

the sanctions order to future applications for admission *pro hac vice*. *See* 675 F.3d at 139, 149.

## B. The District Court Applied the Wrong Standard in Imposing Sanctions

Here, the district court did not make any findings "as to colorability and bad faith," *Schlaifer Nance*, 194 F.3d at 336, that were "supported by a high degree of specificity in the factual findings." *Wolters Kluwer*, 564 F.3d at 114. *See MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 73 F.3d 1253, 1262 (2d Cir. 1996) (vacating sanctions where district court "appeared to have been of the view that no showing of bad faith was necessary" and "engaged in no detailed consideration of what conduct by plaintiff's counsel satisfied the bad faith requirement"); *Eisemann*, 204 F.3d at 396-97 (vacating sanctions where the district court "did not make sufficiently specific factual findings to support its conclusion" that the attorney's conduct was "entirely without color and . . . taken for reasons of harassment or delay or for other improper purposes" (alteration in original)).

Although the district court quoted *Enmon*'s holding that there is no "meaningful difference between" awards made under §1927 and the court's inherent power (*see* SPA-21), the court failed to acknowledge the subjective "bad faith" standard applied in *Enmon* and numerous other decisions of this Court. *See* Point I.A. above. Indeed, the Sanctions Order nowhere acknowledged the legal standard for sanctions, let alone applied it. Instead, the court applied an objective standard based on simple negligence: "[BSF's] failure to examine its own files

fully before concluding that there was no conflict—a conclusion from which it refused to back down—was, in the circumstances, unreasonable." (SPA-23.) [12]

The district court's criticism of BSF repeatedly uses what is at most the language of negligence, faulting BSF for not doing what a "prudent law firm" (SPA-13) would have done. *See* SPA-10 ("the most superficial analysis"); SPA-12 ("no one seems to have comprehended"); SPA-13 ("specific enough for a prudent law firm to have stopped work until it could dig deeper"); SPA-15 ("a fact that should have been apparent to a careful reviewer"); SPA-15 ("missed its obvious import"); SPA-16 ("offered a number of excuses for the delay—including her vacation schedule"); SPA-17 ("obviously did not . . . carefully and exactingly review[] all 39 boxes"); SPA-18 (Host "had to point out the obvious before anyone from or representing BSF would acknowledge the multi-faceted conflict"); SPA-22 ("managed to miss the obvious conflict"); SPA-23 ("failure to examine its own files fully"); SPA-24 ("failed to undertake an appropriate investigation despite its representations to the contrary, or did so in the most cavalier manner"); SPA-25 ("incompetent" document review); SPA-57 ("they did not bother to obtain correct

---

[12] The district's court's statement that the Firm "refused to back down" is inconsistent with BSF's retention of an outside ethics expert, its own internal investigation efforts, its cooperation with Proskauer, and its decision to withdraw immediately upon learning a specific basis to do so.

and complete information"); SPA-57 ("Any competent lawyer should have been able to see what was obvious.").)

In short, the district court's imposition of sanctions rested on findings that BSF's conduct "was, in the circumstances, unreasonable." (SPA-23.) Even if the evidence supported such a finding, actions that are the "result of poor legal judgment" do not constitute "bad faith" actions for sanctions purposes. *See Schlaifer Nance*, 194 F.3d at 340-41.

The district court's opinion—like Host's district court brief—discusses in detail only two plainly inapposite district court decisions. The first decision— which the court said was "particularly instructive" (SPA-21)—*Life Fitness, Inc. v. Sears, Roebuck & Co.*, No. 88 C 263, 1988 WL 37835 (N.D. Ill. Apr. 21, 1988), was decided under Seventh Circuit law. In stark contrast to this Court's requirements, the Seventh Circuit allows sanctions where "the attorney's actions . . . meet the standard of objective unreasonableness." *Claiborne v. Wisdom*, 414 F.3d 715, 721 (7th Cir. 2005) (summarizing Seventh Circuit caselaw). "[O]bjective unreasonableness" is the "key point" for the Seventh Circuit, while "[t]he absence of subjective bad faith is . . . not enough to avoid a sanction under §1927." *Id.* As shown in Point I.A. above, this Court has flatly rejected an objective standard for imposing sanctions. *See MacDraw,* 73 F.3d at 1262 ("§1927 requires subjective bad faith of counsel."); *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91,

37

96 (2d Cir. 1997) ("Rule 11 requires only a showing of *objective unreasonableness* on the part of the attorney or client signing the papers, but § 1927 requires more: *subjective bad faith* by counsel.") (emphasis in original) (quoting *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1245-46 (2d Cir. 1991). *See* pp. 31-33 above. Although the issue before the *Life Fitness* district court was "whether [plaintiff's counsel] unnecessarily required [defendant's counsel] to expend time and effort filing a motion," 1988 WL 37835 at *2, the court found only unreasonable conduct (*e.g.,* "unnecessarily required"), which was sufficient under the Seventh Circuit standard. Moreover, unlike here, plaintiffs' counsel also represented the defendant in *ongoing* litigation and did not withdraw until *after* the disqualification motion was filed. *Id.* at *1-2.

The second case discussed in detail by the district court, *THOIP v. Walt Disney Co.*, No. 08 Civ. 6823 (SAS), 2009 WL 125074 (S.D.N.Y. Jan. 20, 2009), imposed sanctions for counsel's failure to withdraw until the opposing party had "substantially finished" drafting a motion to disqualify. (SPA-22.) In all other respects, however, the facts in *THOIP* are easily distinguished. The conflicted counsel there received a "painstakingly detailed pre-motion letter" explaining the existence of the current conflict. *THOIP*, 2009 WL 125074, at *4. At a pre-motion hearing held on a Monday, the court "personally encouraged [the attorney] to voluntarily withdraw and to do so promptly." *Id.* The judge set an expedited

38

briefing schedule, with moving papers due that Friday.  The court found that there was "no doubt" that the attorney knew he was going to withdraw "well before" the Friday deadline.  *Id.*  However, he did not inform opposing counsel until the deadline occurred, which the district court found to be "unwarranted behavior, in direct contravention of this Court's instructions" and "undertaken in bad faith."  *Id.*  Such bad faith is absent here.  Rather than receiving a "painstakingly detailed pre-motion letter" about a conflict between two existing clients, BSF received assertions of an unspecified former client conflict and silence when it asked for additional details.  Rather than waiting several days to communicate its withdrawal decision, BSF did so within 24 hours.  Nor was the district court involved until well after BSF withdrew.  Thus, the facts and analysis in *THOIP* do not support the imposition of sanctions here.

The district court's error in failing to apply the controlling legal standard is compounded by the fact that BSF's brief set forth the correct standard (Dkt. no. 52 at 25-26), which was not disputed in Host's reply brief (Dkt. no. 57).  Indeed, two months after the district court issued the Sanctions Order, it denied sanctions in

another case where it quoted the controlling law and applied the proper subjective test.[13]

Because the district court "based its ruling on an erroneous view of the law," it "necessarily abuse[d] its discretion." *Schlaifer Nance*, 194 F.3d at 333.

## II.    APPLYING THE PROPER LEGAL STANDARD, THERE IS NO BASIS FOR SANCTIONS

The Sanctions Order must be reversed because BSF acted in good faith in investigating the alleged conflict and in immediately withdrawing once it ascertained the existence of the conflict. While the district court identified shortcomings in what BSF did and did not do during its investigation, none of those criticisms describe sanctionable conduct.

---

[13]    *See Commercial Recovery Corp. v. Bilateral Credit Corp. LLC*, No. 12 Civ. 5287(CM), 2013 WL 8350184 at *6 (S.D.N.Y. Dec. 19, 2013) (McMahon, J.):

> "To impose sanctions under either authority, a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith-that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene,* 204 F.3d 393, 396 (2d Cir.2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 336 (2d Cir.1999)). "[A] claim is entirely without color when it lacks *any* legal or factual basis." *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.,* 607 F.3d 817, 833 (Fed. Cir. 2010). In the Second Circuit, bad faith under § 1927 is a subjective test, and requires a court to find that the offending party's actions were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Schlaifer Nance,* 194 F.3d at 336.

## A. BSF's Good Faith in Addressing the Substantial Relationship Test Precludes a Finding of Bad Faith

The record is clear that BSF and its outside ethics counsel held a good faith belief that, for purposes of Rule 1.9, the question of whether the two representations were substantially related turned on the question of whether the prior representation related to labor relations issues.  (CA-68-70, 72-73, 78, 83, ¶¶ 18-21, 29-30, 44, 57; A-551-54, ¶¶8-15.)  This belief guided BSF's and Mr. Ross's consideration of the conflict issue.  Even though BSF told Host during the December 28, 2012 phone conference the basis for BSF's position, Host did not respond to BSF's repeated invitations to explain why this belief was in error.  Similarly, BSF repeatedly asked Host to provide specific details about the alleged conflict, but Host responded with vague statements about unidentified client confidences, until Host showed BSF the two documents at the February 22, 2013 meeting.  Moreover, those documents showed a different type of conflict ("attacking work product") than Host had theretofore asserted (use of confidential information); and were created in a different context, *i.e.*, advice about potential derivative litigation, rather than the Host-Marriott dispute and settlement to which Host had previously referred.

Because Host did not provide specific information in response to BSF's repeated inquiries, BSF and Mr. Ross were justifiably concerned that Host may have been using the specter of an alleged conflict to gain a tactical advantage.

41

(CA-76-77, ¶41.)  As this Court has recognized, "courts must guard against the tactical use of motions to disqualify counsel." *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).  Simply because a respected law firm asserts that there is a conflict does not mean that there is, in fact, a conflict.  Disqualification motions lodged for tactical reasons are not uncommon, *see* Richard E. Flamm, Lawyer Disqualification, Disqualification of Attorneys and Law Firms (2d ed. 2014), §1.3 at 11 (stating that the "proliferation of disqualification motions" is explained, in part, by increasing "resort to motions to disqualify in an effect to secure a strategic advantage to their clients."), and conflict and disqualification claims are often rejected by courts.  Judicial recognition of such tactics further supports BSF's good faith intentions in its approach to resolving the conflict issue.

BSF's judgment regarding application of the substantial relationship test does not support a finding that BSF acted in bad faith.  This Court has made clear that a finding that a law firm has acted unreasonably, imprudently, or even incompetently does satisfy the high standard for subjective bad faith.  In *Schlaifer Nance*, this Court reversed a sanctions award where the challenged conduct—continuing to pursue a claim in litigation—was nothing "more than the result of poor legal judgment," even though "[q]uite clearly, the appellants *should have known* that the Estate's representations were flawed."  194 F.3d at 340.  Sanctions were inappropriate because "the record actually indicates that the appellants did

42

indeed possess some concrete grounding for their belief that their fraud claim had a colorable basis for assertion and litigation." *Id.* Similarly, in *Muhammad v. Walmart Stores East, L.P.*, 732 F.3d 104, 108-09 (2d Cir. 2013), the Court reversed a sanctions order because, notwithstanding the district court's statement that it was applying the bad faith standard, its analysis "indicate[d] that it was applying an objective reasonableness test." *Id.* at 109. The district court's criticism of the attorney's competence did not support imposition of sanctions. *See id.*; *cf. In re Pennie & Edmonds LLP*, 323 F.3d 86, 88, 93 (2d Cir. 2003) (vacating Rule 11 sanctions where firm filed a client affidavit containing statements that the firm "could not have objectively believed were true"). Thus, the district court's statements that BSF acted unreasonably in various respects cannot, as a matter of law, support the imposition of sanctions.

The district court's finding that Host was "forced to incur significant expenses in preparing the motion to disqualify" (SPA-26) does not support a finding a bad faith. The draft disqualification motion, which Proskauer prepared but never filed, focused primarily on the "attacking work product" conflict theory (CA-8-10, 21-27), the same theory that the district court principally adopted in imposing sanctions. If Host had always intended to focus on that theory, it could have informed BSF of the two key documents before Proskauer incurred substantial expenses by working on the disqualification motion, and BSF would

43

have withdrawn then.  If the Proskauer firm did not identify the documents until mid-February even though they were produced on January 4 (and therefore the firm had to revise the draft motion it was preparing), Proskauer's difficulty in discovering the documents or in recognizing the actual conflict—even though it is a "prudent law firm" (SPA-13)—should absolve BSF of any bad faith claim.

By pointing out that Host was in a position to avoid incurring unnecessary expenses, BSF is not attempting, as the district court stated, to "stand[] its ethical obligations on their head."  (SPA-24.)  Rather, the fact that BSF investigated on its own and cooperatively gave Host several opportunities to specify the basis for the conflict (including after BSF explained the scope of its investigation and why it believed that the two matters were not substantially related (*see* pp. 15-24 above)), coupled with the fact that Host had in its possession, for five weeks, the documents upon which it based its draft disqualification motion, shows that BSF labored under a good faith belief that no conflict existed.[14]

Finally, the district court's statement that "the evidence suggests to this court that BSF did not want to see" the conflict (SPA-25) is belied by the record and

---

[14] "[A] court considering sanctions can and should consider the equities involved before rendering a decision."  *Schlaifer Nance*, 194 F.3d at 341.  *See Black v. Schwartz*, No. 09-CV-2271, 2012 WL 4086775, at *4 (E.D.N.Y. Sept. 17, 2012) (denying sanctions in part because "the Court is not inclined to find that either party has behaved worse than the other").

cannot support a finding of bad faith.  The notion that BSF turned a blind eye to the alleged conflict is refuted by BSF's extensive efforts undertaken to investigate Host's claim, when ignoring the claim would have been more efficient and less costly.  BSF took its obligations under Rule 1.9 seriously; obtained the assistance of a well-regarded ethics expert; and repeatedly took steps to understand why Host maintained there was a conflict.

### B. The Evidence before the District Court Shows that BSF's Actions Were Colorable

"Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue."  *Wolters Kluwer*, 564 F.3d at 114.  The acts by BSF that the district court criticized constituted colorable conduct.

### 1. BSF's Communications to Host Constituted Colorable Conduct

BSF's communications which advised Host that the Firm believed there was no conflict constituted colorable conduct.  The district court criticized BSF because these communications were made before BSF had fully completed the various work streams that it had undertaken to investigate Host's conflict claim.  (SPA-9-11, 13-14, 26.)  The steps BSF took to investigate the conflict prior to each communication, coupled with the Firm's good faith belief concerning application of the substantial relationship test, show that the communications were grounded in

both fact and law.  Before BSF told Host on December 6, 2012 that, on the basis of
its investigation so far, BSF did not have reason to believe the two representations
were substantially similar, BSF had: (i) retained and consulted with outside ethics
counsel; and (ii) received his tentative assessment that BSF was acting in
compliance with Rule 1.9.  (CA-68-69, ¶¶17-19.)  Before making a similar
communication on December 12, 2012, BSF additionally: (i) interviewed a BSF
attorney involved in the prior representation of Host; and (ii) reviewed electronic
billing records and electronic documents concerning the prior representation using
search terms as directed by outside ethics counsel.  (CA-69-70, 72, ¶¶20-21, 29.)
Before telling Host on December 18, 2012 that BSF's opinion continued to be that
no conflict existed, BSF additionally had received a written opinion from outside
ethics counsel stating the tentative conclusion that no conflict existed and the bases
for that opinion.  (CA-72-75, ¶¶29-36.)  The results of BSF's investigation,
coupled with the advice it received from outside ethics counsel, affirmatively
demonstrate that there was factual and legal support for BSF's position.

## 2.  The Conflicts Investigation Constituted Colorable Conduct

The investigation by BSF and Mr. Ross constituted colorable conduct.  In a
declaration submitted in support of BSF's motion for reconsideration, Mr. Ross
responded to the district court's statements in the Sanctions Order that he was
"wildly misinformed" about the scope and timing of BSF's prior representation of

46

Host (SPA- 9-10) and that he was given a "ridiculously unduly narrow description of the scope of the firm's work for Host" (SPA-25), issues that were not briefed in connection with the original motion.  Mr. Ross stated:

> I must respectfully, but emphatically, state that I firmly believe that BSF provided me with all available documents and information that either BSF or I believed relevant and at no time did, or attempted to, mislead or misinform me about the nature or scope of BSF's prior representation of Madison.

(A-551, ¶7.)

In denying reconsideration, the district court addressed Mr. Ross's declaration and stated:  "I remain unconvinced, and I suspect I cannot be convinced, that BSF could possibly have given Ross a full and fair description of the work performed for Host between 2001-2004."  (SPA-57.)  This statement, however, implicitly (and incorrectly) applied an objective standard with the benefit of hindsight.  The district court was assuming that the conflict was so obvious that no "competent lawyer" (*id.*) could have missed it.  But as shown below, the district court misunderstood the evidence and BSF's arguments, which must be viewed in light of BSF's and Mr. Ross's subjective knowledge and understanding at the time the events were unfolding.  The district court thereby compounded, rather than reconsidered, the errors contained in the Sanctions Order.

For example, the district court's description of the "conflict BSF finally acknowledged two and a half months after it was called to the firm's attention" (SPA-56) incorrectly assumes that the conflict which disqualified BSF (potentially

47

attacking its own work product) was the same as the conflict claim that Host had

been asserting for "two and a half months" (use of confidential information from

prior representation). Similarly, the district court's statement, made in hindsight,

that "if you were looking for it, there was NOTHING subtle about this conflict"

(SPA-57) ignores both the nature of the conflict that Host had been asserting, as

well as the different representational context in which the actual conflict arose—

significant differences that informed BSF's subjective state of mind.[15]

      The district court incorrectly characterized BSF as arguing that "any failure

to discover the conflict" was "attributable to Mr. Ross or to Host's ethics counsel,

Proskauer Rose -- and not to BSF." (SPA-56.) In this statement, the court was, in

substance, applying an objective negligence standard as it incorrectly transmuted

BSF's explanation of its subjective good faith state of mind into an excuse for

negligence—a straw man that the court then knocked down. Read in context, BSF

---

[15] The district court's observation that "[a] first year law student on day one of an
ethics course should be able to spot" the conflict (SPA-2) is a further example of
findings by hindsight. BSF does not dispute that a conflict existed (and withdrew
immediately after ascertaining that fact). However, the district court's observation
that "[a] clearer conflict of interest cannot be imagined" was made only after
several sentences in two documents from a file spanning 100,000 pages had been
specifically identified and the parties had submitted detailed affidavits and
briefing. The issue is not whether a first year law student would arrive at the right
answer based on the fully-developed record before the district court; rather, the
issue is whether BSF acted in good faith based on the information it had at the time
the events were unfolding.

48

was not blaming anyone.  *See* BSF Reconsideration Mem. (Nov. 5, 2013, Dkt. no. 102) at 1-3.  BSF's brief quoted Mr. Ross's declaration stating that the conflict was not immediately recognized "based upon [Mr. Ross's] focus, as BSF's outside ethics counsel, on issues and search terms that did not lead [him] to recognize the significance" of the two key documents.  (BSF's Reconsideration Br. (Nov. 5, 2013, Dkt. no. 102) at 3 (quoting A-551, ¶8).)  The point of this averment was to show that BSF cooperated with Mr. Ross's investigation.  This cooperation, which the district court dismissed as an effort by Mr. Ross to "fall on his sword" (SPA-56), shows that BSF acted in subjective good faith.

According to the district court, "what happened here was far, far worse" than a "sloppy computerized document search by outside counsel" (SPA-57) because BSF represented to the court that it "had checked for conflict carefully and seriously" but that it "could not have discovered the conflict – because it was subtle."  (SPA-57).  The district court, however, again misunderstood BSF's argument.   BSF explained that Mr. Ross and Ms. Jimenez Train did not make the connection between the documents discussed at the February 22 meeting and the allegations in the complaint because they "did not detect the more subtle issue of whether Host's settlement with Marriott in 2002 benefited Host."  (CA-83, ¶57.) BSF did not argue that this "subtlety" rendered detecting the conflict impossible— although, as the district court acknowledged, "[f]iguring out the precise contours of

BSF's former representation, and its relationship to a conspiracy that was

supposedly being hatched at exactly the same moment, did indeed require some

connecting of the dots" (SPA-25) – a finding that supports BSF's subjective good

faith.  Rather, BSF raised the issue to explain why it did not ascertain the conflict

sooner.  In any event, failure to detect "the obvious" (SPA-57) is not sufficient to

show bad faith, and the district court's characterization of BSF's argument again

confuses an objective with a subjective standard—BSF's arguments and evidence

were directed to showing that its subjective state of mind was one of good faith.

The court incorrectly transformed that discussion into an argument about the

objective reasonableness of BSF's conduct.

Further, the electronic search of billing records and documents conducted by

BSF and Mr. Ross constituted colorable conduct.  The search terms selected by

Mr. Ross were intended to identify a pool of documents for review that were

related to labor relations issues.  The district court faulted the search because, in its

view, it was too narrow and the absence of documents containing those terms

might have some bearing on the conflict issue.  (SPA-12.)  But the selection of

those terms was consistent with BSF's good faith belief that the substantial

relationship test would turn on whether the prior representation of Host involved those issues.[16]

Moreover, the fact that the two documents discussed at the February 22, 2013 meeting were among the documents that Ms. Jimenez Train and Mr. Ross reviewed (CA-86, ¶57;  A-554, ¶16) does not mean that BSF's investigation was somehow "designed to uncover nothing at all"  (SPA- 25) or that BSF did not "carefully and seriously" (SPA-57) check for conflicts.  Rather, as shown in Ms. Jimenez Train's declaration, Ms. Jimenez Train and Mr. Ross, in good faith, did not make the connection between the portions of those documents and the relevant paragraphs in the complaint.  (CA-86, ¶57.)  While failing to understand the connection between the complaint and these two documents is regrettable, the subjective understanding on the part of Ms. Jimenez Train and Mr. Ross of the facts (including the type of conflict and the prior representation identified by Host) informed the parameters of BSF's investigation and the lens through which they

---

[16] The district court suggested that BSF's electronic key word search should have, but did not, hit on various documents that contained the search terms.  (SPA-15; SPA-57.)  In so doing, the district court misunderstood the evidence.  Ms. Jimenez Train's declaration is clear that the electronic search yielded no *responsive* documents (*i.e.*, "did not reveal any references to a labor conspiracy"), not that the electronic search produced no documents at all that contained any of the search terms identified by Mr. Ross.  (*See* CA-72-73, 77-78, ¶¶ 29, 30 & n.4, 43.)

reviewed documents to discern if a substantial relationship existed between the two allegedly conflicting representations.

BSF's investigation was grounded in fact because it sought to address the issues raised in the communications received from Host and Proskauer prior to February 22, 2013, in light of the information that they provided, which pointed to a different—and never substantiated—conflict: that BSF gained non-public information about Host that it might use to Host's detriment and to benefit Madison in the new representation. (*See* A-393-94 ("[BSF's] services for Host focused on that very relationship, a focus that gave the firm access to 'information that would normally have been obtained' in such a representation.") However, the conflict that actually led to BSF's disqualification and to the Sanctions Order involved the possibility that BSF would have to attack its own work product. Moreover, BSF generated that work product when it was advising Host with regard to defenses against potential derivative claims. It was not generated during the course of advising Host about its claims against Marriott, which is the advice that Host identified prior to February 22.

On the basis of the conflicts investigation that was undertaken in good faith, BSF's decision to file the complaint against Host, among others, on January 13, 2013, constituted colorable conduct. By the time BSF filed the complaint, the Firm had investigated the alleged conflict for five weeks; completed its search of

billing records and documents using word searches selected by outside ethics counsel; received written advice detailing outside counsel's tentative conclusion that there was no conflict and the bases for that conclusion; interviewed lawyers who had worked on BSF's prior representation of Host; and repeatedly asked Host and its lawyers to explain why they believed that there was a conflict when other signs pointed to the contrary.

Moreover, as discussed above, Ms. Jimenez Train and Mr. Ross were justifiably concerned that Host may have been seeking to use the threat of disqualification as a tactical weapon. *See* Point II.A. above. Given that they believed in good faith that there was no conflict under the substantial relationship test, delaying the filing of the complaint would have exposed Madison, a current client of the Firm, to the very tactical disadvantage that BSF believed might have been Host's strategic objective. Thus, BSF's decision to file the complaint was grounded in both fact and law.

## C. There Is No Evidence of an Improper Purpose

Challenged conduct cannot be sanctioned unless it was undertaken for an improper purpose, and such a finding is "supported by a high degree of specificity in the factual findings." *See Wolters Kluwer*, 564 F.3d at 114 (citing *Schlaifer Nance*, 194 F.3d at 336-37). An inference of improper purpose can be made "*only if* actions are *so completely without merit* as to *require* the conclusion that they

53

*must have been* undertaken for some improper purpose such as delay." *Enmon*, 675 F.3d at 143. No such evidence exists here.

For example, the Sanctions Order states: "The only inference I can draw from the record before me – and it is a compelling inference – is that BSF would not agree to withdraw until it was faced with the fact that Host was about to file a motion to disqualify on the public record." (SPA-26.)

This statement does not show an improper purpose for two reasons. First, the statement is contradicted by the Sanctions Order itself. Earlier in its opinion, the district court found that "[w]hat changed BSF's and Ross' minds was seeing— and finally understanding the import of —two documents." (SPA-18.) Ms. Jimenez Train's declaration is in accord. (CA-82-84, ¶¶ 53-59.) Because "seeing" and "finally understanding the import" of the documents on February 22, 2013 is "what changed BSF's and Ross' minds" about the existence of a conflict (SPA-18), it is impossible that the *only* inference to be drawn is that the Firm agreed to withdraw because "Host was about to file a motion to disqualify." (SPA-26.)

Second, there is no evidence that BSF was concerned about Host filing a motion. If BSF were motivated by such concerns, one would expect BSF to have jumped at the opportunity to quietly pay Host's legal fees after reimbursement was demanded. But BSF refused to pay because the Firm had taken steps to withdraw as soon as it learned of the critical documents on February 22. (A-208, ¶20.)

54

Nor can there be an improper purpose in the district court's observation that "[e]ither [Ms. Jimenez Train's] definition of 'enhanced care' differs from mine or her statement is patently false." (SPA-15.) The district court's statement itself offers an equally plausible explanation: that the district court has a different understanding of the term "enhanced care," which apparently means to the court that a reviewer applying "enhanced care" cannot make mistakes without incurring sanctions. Ms. Jimenez Train, however, submitted an affidavit which explained that she "did not make the connection" between the ███████████ and the allegations in the complaint. (CA-83, ¶57.) The district court's statement that Ms. Jimenez Train "missed its obvious import" (SPA-15) is a plausible explanation that does not constitute bad faith.

None of the district court's discussion in the Reconsideration Order supports the finding of an improper purpose. As discussed above (at pp. 46-50), the district court not only applied an objective standard in denying reconsideration, but also misunderstood BSF's arguments and the application of those arguments to the evidence.

For the foregoing reasons, there is no basis to find with a high degree of specificity that BSF's conduct was completely without merit and "infinitely more egregious than that of the conflicted counsel in *Life Fitness* and *THOI[P]*." (SPA-22.) These cases are entirely distinguishable. *See* pp. 37-40, above. Both *Life*

55

*Fitness* and *THOIP* involved conflicts arising from representation of an adversary against a *current* client. *See Life Fitness*, 1988 WL 37835, at *1; *THOIP*, 2009 WL 125074, at *1. Where current clients are involved, "adverse representation is prima facie improper." *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976); *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010). The substantial relationship test does not apply; rather, the attorney "must be prepared to show . . . that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Cinema 5*, 528 F.2d at 1387. *See id* (describing this test as a "heavy burden"); *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 749 (2d Cir. 1981) ("a burden so heavy that it will rarely be met."). Neither *Life Fitness* nor *THOIP* involved the application of the substantial relationship test to representation of a former client, and those cases are therefore inapposite.

# CONCLUSION

For the foregoing reasons, the Court should vacate the order of the district court imposing sanctions on BSF.

October 8, 2014

By:

Respectfully submitted,

David A. Barrett
Donald L. Flexner
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael S. Ross
LAW OFFICES OF MICHAEL S. ROSS
60 East 42nd Street, 47th Floor
New York, New York 10165
Telephone: (212) 505-5200
Facsimile: (212) 505-4054

*Attorneys for Appellant Boies, Schiller & Flexner LLP*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 13,596 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

October 8, 2014

David A. Barrett
Donald L. Flexner
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael S. Ross
LAW OFFICES OF MICHAEL S. ROSS
60 East 42nd Street, 47th Floor
New York, New York 10165
Telephone: (212) 505-5200
Facsimile: (212) 505-4054

*Attorneys for Appellant Boies, Schiller & Flexner LLP*

# Special Appendix

i

## TABLE OF CONTENTS
### (Redacted Version)

**Page**

Sanctions Order, dated October 16, 2013 .................. SPA-1

Sanctions Order, filed October 31, 2013
   (Redacted Version)................................................ SPA-28

Order Denying Motion for Reconsideration, dated
   November 6, 2013 ................................................ SPA-55

Order Denying Motion for Reconsideration of the
   October 16, 2013 Order, dated November 6, 2013 SPA-56

Order Awarding Sanctions, dated August 8, 2014 ..... SPA-58

Supplemental Judgment, dated August 11, 2014 ....... SPA-60

28 U.S.C. § 1927........................................................ SPA-61

SPA-1-SPA-27

SANCTIONS ORDER, DATED OCTOBER 16, 2013

**(REDACTED)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

MADISON 92ND STREET ASSOCIATES, LLC,

        Plaintiff,

   -against-                      13 Civ. 291 (CM)

MARRIOTT INTERNATIONAL, INC., HOST
HOTELS & RESORTS, INC., DIAMONDROCK
HOSPITALITY CO., and the NEW YORK
HOTEL & MOTEL TRADES COUNSEL, AFL-CIO,

        Defendants.

—————————————————————————x

DECISION AND ORDER GRANTING DEFENDANT HOST
HOTELS & RESORTS, INC.'S MOTION FOR SANCTIONS
AGAINST BOIES, SCHILLER & FLEXNER

McMahon, J.:

      A decade and more ago, the law firm of Boies, Schiller and Flexner (BSF) represented

Host Hotels & Resorts ("Host") in a long running dispute with Marriot International Inc.

("Marriott"). The two companies resolved their dispute with a settlement that was approved in

the late spring of 2002 ("the 2002 Settlement"). Among the other tasks the firm performed in

connection with that representation, BSF was asked to, and did, advise a Special Committee of

Host's Board that certain agreements contemplated by the proposed settlement were ██████

████████████

      In early 2013, BSF – now representing a once-bankrupt limited liability corporation that

owned an Upper East Side "Courtyard Marriott" hotel – commenced the instant action against,

*inter alia*, Marriott and Host, the parties to the 2002 Settlement . The complaint alleges that, at

the very moment when the 2002 Settlement was consummated, Host and Marriott entered into a

conspiracy to ensure that certain hotels owned or operated by Marriot would not be union hotels, while others (including the hotel in which plaintiff here invested) would be. The pleading alleges that Host's behavior in the years following – including behavior that was presumably dictated by the terms of the 2002 Settlement – was not in the company's best interest and was "inexplicable" except by reference to this purported conspiracy.

A clearer conflict of interest cannot be imagined. A first year law student on day one of an ethics course should be able to spot it.

BSF, which holds itself out as one of the country's preeminent law firms, did not.

Not when it undertook a representation that would inevitably attack its own work for Host.

Not when its former client raised the issue – which occurred as soon as Host learned that Plaintiff had retained BSF and read a copy of the draft complaint that its former lawyers had prepared.

Not when Host's counsel in this lawsuit, the Proskauer Rose firm, formally notified BSF in writing that its prior representation of Host created a conflict.

Not when the firm, after being warned about the conflict, filed a lawsuit containing allegations as to which its own attorneys (including quite possibly name partner David Boies, who billed time to both representations) were important -- indeed virtually necessary -- *rebuttal* witnesses.

Not even when a BSF partner reviewed key documents, including a 23 page memorandum addressed to Host's general counsel, in which BSF opined that Host's Board ███

███████████        ████████        ████████████        ███████

2

Eventually, after Proskauer prepared a motion to disqualify that spelled out the situation in words of one syllable, BSF capitulated and withdrew. Host now moves for sanctions in the amount of attorneys' fees it incurred in getting BSF off this case.

The motion is granted.

## STATEMENT OF FACTS

The relevant facts are as follows:

The 2002 Settlement

Host is a self-managed and self-administered public real estate investment trust. Host conducts its operations through an operating partnership, Host Hotels & Resorts, L.P., a Delaware Limited Partnership, of which it is the sole general partner. Host currently owns 103 hotels in the U.S. and 15 properties internationally.

Host enters into management agreements with independent third parties to manage the hotels. The hotel management companies manage under their brands, which are commonly known as Marriott, Ritz-Carlton, Westin, Sheraton, W, St. Regis, The Luxury Collection, Hyatt, Fairmont, Four Seasons, Hilton, and Swissôtel. Marriott operates dozens of hotels for Host, including the New York Marriott Marquis and the New York Marriott Downtown. (Abdoo Decl. ¶ 3.)

Beginning in 2000 and continuing through at least 2004, BSF actively served as one of Host's outside counsel, working on numerous matters. (*See* Abdoo Decl. ¶ 4.) Among them an investigation into whether Marriott had violated various obligations to Host in connection with its management of Host's properties.

The BSF team on this particular engagement included numerous attorneys from BSF's New York City and Armonk, New York offices, all of whom worked significant numbers of

3

hours for Host on the matters discussed herein.[1] BSF attorneys spent almost two years undertaking with others an all-encompassing review of the relationship between Marriott and Host.  (Abdoo Decl. ¶¶ 7-10; Leader Decl. Ex. 1.)  They were given access to substantial information, including confidential and privileged information, concerning the details of Host's management and other agreements with Marriott, Host's views and goals with respect to its future relationship with Marriott, and what aspects of the relationship with Marriott Host was willing to modify.  BSF's attorneys worked directly with Host's General Counsel and its executives, senior management, and other in-house lawyers in developing strategies to resolve the issues in Host's best interests.  (Abdoo Decl. ¶¶ 7-8.)  BSF even drafted a detailed, proposed complaint against Marriott.

Settlement discussions between Host and Marriott began toward the end of 2001.  In the spring of 2002, Host – with the assistance of BSF and its outside corporate counsel, Hogan & Hartson (now Hogan Lovells) – negotiated and executed a global settlement with Marriott. The settlement included a number of new written agreements governing the relationship between Marriott and Host going forward, as well as amended and restated management agreements that provided Host with additional benefits, including benefits relating to Host's New York City hotels.  (Abdoo Decl. ¶ 10.)  Hogan & Hartson was the principal drafter of term sheets and modified agreements with Marriott, but BSF attorneys participated extensively behind the scenes in Host's efforts to settle the dispute between Host and Marriott.  (Abdoo Decl. ¶ 9.)

---

[1] BSF billing records show the following lawyers worked on the matter: current firm partners David Boies (133.4 hours), William Marsillo (244.75 hours), and Marilyn Kunstler (89.9 hours), and associate (now Counsel) Roseanne Baxter (614.9 hours), as well as former partners Andrew Hayes (700.8 hours) and Paul Verkuil (447.6 hours), and associates, Diana Clarke (351.6 hours), Ann Nacinovich (317.2 hours), David Feuerstein (269.6 hours), Kate Ruggieri (246.1 hours), Edward Swaine (100.75 hours), Barbara Clay (47.2 hours), Melissa Kho (43.1 hours), Thomas McMahon (33 hours), Rudolph Baron (28 hours), Emeye Gugsa (25.5 hours), Christina Lewicky (23.7 hours), and Michael Herz (9.1 hours). (*See* Leader Decl. Ex. 1.)

4

BSF was also retained specifically to give advice on ██████████████

█████████████████████████████████████████████████████████

██████████ A Special Committee of the Host Board engaged, "Boies, Schiller & Flexner

LLP to advise the Special Committee regarding the issues raised by its investigation [of potential

claims against Marriott], to engage [Marriott] regarding those issues *and to reach an appropriate*

*resolution of those issues that would be in the best interests of Host.*"    (*Id.* ¶¶ 5, 12;

Ex. 1.)(Emphasis added) In carrying out the assignments, BSF drafted a 23 page  confidential

memorandum dated May 6, 2002, a copy of which is attached to the Declaration of Elizabeth A.

Abdoo ("Abdoo Decl.") as Ex. 1.  In this memorandum, BSF opined as follows:

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

BSF echoed that ███████████████████████████ in the conclusion of its

memorandum:

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

BSF recognized that its work for Host was sensitive and important; it also recognized

and asserted, vigorously, that the information to which it had access during that period included

highly sensitive business information.  In 2003, after the settlement had been consummated, Host

asked BSF to provide advice and to respond on its behalf to a subpoena issued by plaintiffs in a

California state court action against Marriott.  The plaintiffs, owners of other hotels operated by

Marriott, sought documents relating to the settlement between Host and Marriott and the

amended management and other agreements.  (Leader Decl. Ex. 2.)  BSF, principally through

5

attorney Roseanne Baxter (who had been fully involved in BSF's examination of issues relating to Marriott), spent several months reviewing and producing Host's documents in response to the subpoena and negotiating with the plaintiffs' firm concerning its scope. (Leader Decl. Ex. 1.) Ultimately, BSF filed a non-party opposition in the California court on Host's behalf, opposing plaintiffs' motion to compel production of "settlement-related correspondence between Host and Marriott." (Leader Decl. Ex. 2 at 2.) BSF argued, among other things, that the party serving the subpoena was "seeking to invade the confidentiality of Host's *most sensitive business deliberations* and discover *competitively sensitive information*." (*Id.* at 3. (Emph. supp.).)

In all, BSF represented Host for four years concerning Host's relationship with Marriott. BSF devoted over 3700 hours to the representation and billed Host approximately $1,250,000 for its services. (Leader Decl. Ex. 1.)

<u>BSF Represents Madison Adverse to Host</u>

On December 4, 2012, Marriott forwarded to Host a draft complaint that BSF had threatened to file against Host, Marriott, and others on behalf of Madison. (Abdoo Decl. ¶ 14.) Madison is the former owner of a Courtyard by Marriott hotel located on East 92nd Street and First Avenue in Manhattan (the "92nd Street Hotel"). (Compl. ¶ 10.) According to the complaint, in 2002, Madison entered into a management agreement with Courtyard Management Corporation ("Courtyard"), a Marriott affiliate, pursuant to which Madison would build and Courtyard would manage and operate the 92nd Street Hotel. (*Id.*) Seven years later Madison, represented by Katten Muchin Rosenman LLP, filed suit in New York state court against Courtyard (and only against Courtyard) (the "State Court Action"). The complaint in that action asserted, in pertinent part, that Courtyard had induced Madison to contract with Courtyard to managed Host's hotel located on First Avenue and 92nd Street in Manhattan by, among other things, misrepresenting the extent to which the hotel's work force had become unionized and the

adverse financial impact that being subject to a union contract would have on Madison's investment.

On information and belief, the State Court Action was stayed pending Madison's bankruptcy proceedings. When it became active again, BSF replaced Katten Muchin Rosenman as Madison's lawyers in the case, and BSF drafted the pleading that was circulated to Marriott and Host in early December 2012.

Before undertaking its representation of plaintiff, BSF's General Counsel, Nicholas Gravante, performed a "conflict check," which revealed that Host had been a client of the firm some years earlier. The record does not include much information about exactly what Gravante did next. It is clear enough what he did *not* do: he did not ask to review either the file or the billing records related to the earlier representation. He nonetheless concluded that the new matter was not the same or substantially related to the former representation.[2]

BSF proceeded to draft a complaint, naming Host as a party defendant. That pleading is before the court as Jimenez Train Ex. 6. In its moving papers, counsel for Host represents that it was "essentially identical" to the complaint that was ultimately filed in this court on January 13, 2013. Host is correct. In fact, the critical paragraphs of the pleading – the ones that encapsulate the conflict – are identical in the draft complaint that Host received on December 4, 2012 and the pleading filed with this court six weeks later. They read as follows:

**Host and Marriott Strike a Deal to Cooperate**

60.      To help boost its balance sheets, Host needed to ensure that the workers at the Marriott Marquis and the Marriott Financial Center would not be unionized. Host, however, recognized that it did not have sufficient power to make a deal directly with the Union. … But Host did have the ability to extend its management agreements with Marriott for the Marriott Marquis and the Marriott Financial Center, and Host

---

[2] We know that he did not retrieve the files or the billing records because they had to be retrieved and reviewed months later.

could also provide additional hotels for Marriott to manage under new management agreements.

61.    Unlike Host, Marriott had the power to swell the Union's ranks and add millions of dollars in additional dues. ... But Marriott did not stand to gain very much – and had much to lose – from sacrificing its substantial employee roster to the Union merely for the sake of its close relationship with Host. ... Marriott could not afford to sacrifice that competitive advantage in a deal with the Union.

62.    Recognizing that they each had something the other wanted, *Host and Marriott conducted secret meetings and negotiations in mid-2002 in their shared office building in Bethesda to come to a mutually-beneficial solution to their problems.* The representatives at these meetings discussed, negotiated, and agreed upon a specific strategy to harm and eliminate their non-union competitors, including Madison, for the benefit of the conspiracy.

63.    Specifically, Host agreed that in exchange for Marriott's assistance in convincing the Union to protect the Marriott Marquis and Marriott Financial Center from unionization, Host would retain Marriott as the manager of both properties, and would sign additional long term management agreements with Marriott for the management of other hotels acquired in and around that time period.

64.    Naturally, when conspirators enter into a conspiracy, they take steps to conceal the existence of the conspiracy and its goals, strategies, and targets. Such conspiracies operate in secret, and the conspiracy between Host and Marriott – horizontal competitors – is no different. *That Marriott and Host entered into such an agreement is confirmed by their subsequent conduct – which is otherwise inexplicable.* (Emphasis added)

It takes but a moment to recognize that these paragraphs accuse Host and Marriott of entering into an agreement in mid-2002 – the very time when Host, advised by BSF, entered into multiple agreements with Marriott that restructured and extended their relationship – which agreement committed it to "otherwise inexplicable" conduct as part and parcel of a conspiracy to eliminate their non-unionized competitors. The coincidence in timing means that the purported conspiracy would at a minimum have been entered into in the context of the 2002 Settlement, and might well have been part of it, since the "additional long term management agreements" (¶ 63) that were signed in the spring of 2002 were part and parcel of that settlement. It takes but another moment to understand that the lawyers who advised Host ██████████████

8

███████ and who helped draft the documents here under attack as dictating behavior "inexplicable" except by reference to a RICO conspiracy, would be critical witnesses about the very matters asserted in these paragraphs. This is not ethical rocket science.

The very day she received a copy of the draft complaint, Elizabeth Abdoo, Host's General Counsel, spoke with BSF counsel Roseanne Baxter, who had worked extensively on the Host-Marriott settlement back in 2001-02. (Abdoo Decl. ¶ 16.) Abdoo expressed her concerns about BSF's representation of Madison in the threatened litigation. Abdoo followed up their conversation with an email that afternoon. (*Id.*)

Baxter did not respond to Abdoo. Instead, on December 6, 2012, Abdoo heard from Magda Jimenez Train, deputy general counsel of BSF. Jimenez Train asserted that BSF had investigated Abdoo's allegation of a conflict but the firm did "not have any reason to believe that the potential lawsuit by Madison 92nd Associates referenced in your email is the same or substantially related to any matter in which we previously represented Host, and therefore, there is no actual or potential conflict." (Abdoo Decl. Ex. 3.)

BSF reached this conclusion after consulting with Michael S. Ross, an attorney who specializes in ethics matters and whose work is well known to the court. In a conference call among Ross, Gravante,. Jimenez Train and Helen Maher (a BSF partner who was working on the representation of Madison 92nd), which was convened after receipt of Abdoo's email, Ross was told that the new representation concerned a conspiracy among Marriott, Host, DiamondRock and the New York Hotel & Motel Trades Council, AFL-CIO (the "Union") to eliminate non-union participants from the New York City hotel market. Ross was also told that BSF had previously advised Host "in connection with matters relating to Marriott's financial misconduct toward Host." (BSF Brief in Opposition at 9) Obviously, if that is all Ross was told about the

9

2002 representation, he was wildly misinformed about its scope – and quite possibly its timing as well.

BSF is careful in its papers to characterize Ross' December 5 conclusion as "tentative" (Id). However, it was not so "tentative" as to prevent Jimenez Train from telling Abdoo on December 6 that no conflict existed -- and not so "tentative" as to cause the BSF attorneys to stop work on their new representation until the scope of the old one could be ascertained.

<u>Further Investigation</u>

On December 6, Ross and his associate, James D. Liss, together with Jimenez Train, conducted their first interview with a lawyer who had actually worked on the Host matter – Roseanne Baxter.  Whether this interview occurred before or after Jimenez Train responded to Abdoo is not clear. According to BSF's opposition papers (which do not include any declaration from Baxter herself), Baxter told her questioners that the prior engagement related to Marriott's unfair financial treatment of Host in the context of their franchisor/franchisee relationship, and that it is not involve "BSF's addressing labor or union issues." (Brief in Opposition at 10) I do not know how pointed the question were that were put to Baxter; I do not know whether she was asked how the dispute on which she worked was resolved, or when it was resolved, or whether the resolution of that dispute was reflected in any agreements that were entered into in mid-2002, or whether anyone else working on the matter (other law firms were involved) was tasked with "addressing labor or union issues."

After interviewing Baxter, Ross opined that he still held to his "tentative" conclusion. But even accepting at face value the opposition brief's description of what Baxter said during the December 6 interview, it does not appear that her statements were subjected to anything but the most superficial analysis. For example, it does not seem to have occurred to Ross, Liss or

10

Jimenez Train that the *absence* of any discussion of "labor or union issues" in connection with the mid-2002 resolution of a long-running and multi-faceted dispute between Marriott and Host might actually undermine, or even give the lie to, the very serious allegation of an anti-union conspiracy that BSF was preparing to make on behalf of its new client. Nor does it seem that they considered whether, if Host and Marriott did indeed reach some sort of conspiratorial agreement in mid-2002, it was likely reached in the context of settling the ongoing "financial dispute" between the two companies – a settlement that was effected *at exactly the same time* and that involved the consummation of numerous new agreements.

Of course, any such analysis was rendered more difficult by the fact that Ross and Liss *did not even read the draft complaint until after they had interviewed Baxter and delivered their "tentative" conclusion. (*Brief in Opposition at 11). I confess that I do not see how anyone could have asked Baxter an intelligent question about the scope of the prior representation without reading Maher's draft complaint.

Ross did suggest that BSF retrieve its billing records from the prior representation and search the firm's electronic case files to identify documents containing certain key terms that he, Liss, and Jimenez Train decided might demonstrate a "substantial relationship" between the former and current matters. Neither of those elementary tasks was undertaken prior to reaching a conclusion that no conflict existed and communicating that conclusion to the firm's former client – not once, but twice. On December 8 – before either the billing records or the document search had been concluded -- Jimenez Train sent a second email to Abdoo that said:

> Based on our investigation thus far, we do not have any reason to believe that the potential lawsuit by Madison 92nd Associates referenced in your email is the same or substantially related to any matter in which we previously represented Host. If you have any basis to believe otherwise, please let us know as soon as possible.

11

Over the next few days, Abdoo and Jimenez Train missed several opportunities to connect and discuss the matter by telephone. I intuit that it was during this period that Host retained Proskauer Rose to represent it in connection with the conflict issue.

On December, 12, Jimenez Train told Mr. Ross that the search of the firm's electronic billing records and files did not turn up any references to a "labor conspiracy" in connection with the prior Host representation.[3] This confirmed Mr. Ross in his "tentative" conclusion, which he enshrined in a memorandum of even date. Of course, the key word search was doomed before it began, since the terms chosen – "union," "labor," "collective," "bargaining" and "employees" – carved out a very small universe that was reflective of an unduly narrow view of the scope of the prior representation (the result would have been rather different, I suspect, if "management agreement" had been among the key words). Furthermore, no one seems to have comprehended that the absence of those labor-related terms from BSF's documents might have some bearing on the conflicts question.

Proskauer Enters the Lists

Also on December 12, Proskauer made its entrance. J. Charles Mokriski, Proskauer's professional responsibility counsel, sent a letter to Ms. Jimenez Train of BSF (Jimenez Train Ex. 10), which said the following:

(1) BSF had represented Host in connection with a dispute with Marriott for an extended period of years encompassing the time frame of the conspiracy alleged in the draft complaint – for which it was paid handsomely.

(2) The resolution of that dispute culminated in an agreement about which BSF would have a substantial amount of information.

---

[3] Of all the assertions in the brief in opposition, this is by far the most absurd. Of course the billing records did not contain any references to a "labor conspiracy." I would be shocked to learn that an attorney employed by BSF would have written a diary entry indicating that he or she was advising a client about entering into a "labor conspiracy."

(3) The firm would also necessarily have obtained a substantial amount of non-public

information about Host, which it was ethically prohibited from disclosing to any third

party.

Mokriski demanded, on Host's behalf, that BSF turn over to Host all its records in connection

with the 2002 Settlement and the attendant representation, and immediately stop work on the

Host matter.

Now, it is absolutely true that Mokriski's letter does not spell out the conflict in words of

one syllable. It does not say, "Look, the fair import of your draft complaint is that, in settling

their dispute in the middle of 2002, Marriott and Host entered into some sort of illicit conspiracy.

You know that's not true, because you helped to negotiate their settlement and advised the Board

that ███████████████████████████████████████████████████████████

████████████████ And if it were true, you as our lawyers would have been a participant in or

aider and abetter of the conspiracy. Either way, you have confidential information from Host that

will touch on the allegation that our 2002 Settlement with Marriott was tainted with conspiracy;

and some of your lawyers, including David Boies, might well be critical witnesses whose

testimony could clear us of these charges. So it is obvious that you can't represent Host in this

proposed lawsuit." It is not clear from the record that Mokriski knew enough to be so specific.

But he was specific enough for a prudent law firm to have stopped work until it could dig deeper

than BSF already had.

On December 18, Jimenez Train responded to Mokriski's letter via email. She continued

to deny that any conflict existed. How she could have made such an assertion is puzzling, since it

is clear from her email that BSF had not yet reviewed most (if any) of BSF's files relating to its

representation of Host: "In the meantime, *we will be gathering* Host's records to deliver to Host.

Since we have not represented Host in many years, *all or most of these records have been archived and need to be retrieved and reviewed* so that we can comply with your request." (Mokriski Decl. ¶ 7, Ex. 2.) (Emph. supp.). I doubt that BSF had any intention of retrieving and reviewing the files until Host demanded that they be produced.

On December 28, 2012, the two sides held a conference call to discuss the issue. Jimenez Train explained that BSF's keyword searches of its electronic documents relating to its representation of Host had yielded nothing responsive, so BSF believed that its prior representation of Host had nothing to do with the issues raised in the (then) draft complaint. (*Id.* ¶ 10.) Ross added that he personally had looked at over 1,000 of BSF's documents (presumably retrieved from electronic files) and at every BSF billing entry associated with its engagement, but had found nothing to indicate a conflict. (*Id.* ¶ 11.) I do not know which 1,000 documents Ross reviewed; the record does not indicate whether he looked at, for example, BSF's 23-page letter opining that the 2002 Settlement was ▮▮▮▮▮▮▮▮▮▮

Jimenez Train and Ross also represented that they had interviewed BSF attorneys David Boies, Roseanne Baxter, and William Marsillo, and former BSF partner Andrew Hayes, but uncovered no conflict. (*Id.*)[4]

BSF obviously felt that it had done enough conflict checking. On New Year's Eve, BSF filed an amended complaint in the State Court Action. This amended complaint repeated many of the same allegations as in the draft complaint in this action. Host was not, however, named as a defendant in the state court pleading.

---

[4] Only the Baxter interview appears to have taken place in the few days immediately following Abdoo's original December 4 complaint. None of the interviews took place before Ross first reached his "tentative" conclusion on December 5. The record does not reveal when the other lawyers were interviewed. Significantly, none of the lawyers involved in the original representation has submitted a sworn statement in connection with BSF's opposition to the sanctions motion.

BSF Turns Over Its Host Documents

During the December 28 telephone call, Proskauer asked when Host would be receiving BSF's documents. (*Id.*) Jimenez Train advised that she would not turn over files before reviewing them. Six days later, on January 4, 2013, BSF produced five boxes of documents from BSF -- all of which, BSF represented, were from the electronic files that had been searched using keywords. (*Id.* ¶ 13.) Jimenez Train revealed that this was the beginning of a rolling production; BSF had another 20 to 30 boxes of documents, which she did not intend to produce until she could review them. (*Id.* ¶ 12.) From this it is clear that BSF had not reviewed the vast majority of its files before concluding that it had no conflict.

Jimenez Train avers, in her declaration to this court, that she reviewed those documents with "enhanced care" before turning them over. (*Id.* ¶ 47.) Either her definition of "enhanced care" differs from mine or her statement is patently false. For one thing, the first five boxes of documents contain drafts of the revised Host/Marriott management agreements, which (not surprisingly) include both a provision concerning "Hotel Employees" and an entire section titled "Collective Bargaining Agreements." Somehow these drafts were not picked up in the key word search, even though words like "unions" and "collective bargaining" were among the key words – a fact that should have been apparent to a careful reviewer. Far more significant, the first production also included the 23-page memorandum detailing BSF's analysis of the revised management agreements and concluding that ███████████████████████████ – a memorandum that was not only ████████████████████████████ ███████████████████████ but was proof positive that BSF had a serious conflict. (Abdoo Decl. Ex. 1.) Assuming Jimenez Train read that document at all, let alone with "enhanced care," she missed its obvious import.

15

It had taken BSF almost a month to provide the first five of the "25 to 35" boxes of documents relating to the former representation that BSF possessed.  (Mokriski Decl. ¶ 14, Ex. 4.) (There were, in the end, 39 boxes of documents)  On January 9, 2013, Proskauer complained about the delays in turning over the remainder of Host's files and insisted on a date by when all the files would be produced.  Jimenez Train did not, however, agree to provide the documents immediately, or provide a date when BSF's "rolling production" would be complete.  She offered a number of excuses for the delay -- including her vacation schedule -- but insisted that BSF was taking Host's "allegations" of a conflict "very seriously" and that the firm's "top priority" since December 12 had been "to determine whether there was any merit to the allegations in [the Proskauer] letter, and whether there was any legal basis to withdraw." (Mokriski Decl. Ex. 4.)  Jimenez Train insisted "assembly of the file and our substantive review of the file......[was] that much more important and *a task that requires enhanced care and attention by me personally and our outside ethics counsel*." (*Id.*)(Emphasis added). It is obvious that she had not completed this important work on the day she wrote the note – January 12, 2013.

Nonetheless, on the very next day, January 13, 2013 -- without any prior notice to Host, and while discussions concerning the conflict were ongoing -- BSF filed its complaint against Host in this Court.  The complaint is essentially identical to the draft complaint that BSF had threatened to file several weeks earlier.  The firm filed the lawsuit even though BSF knew full well that Host (and Proskauer) were reviewing the first files that BSF had produced and were awaiting the rest of the production.  (*Id.* ¶ 16.)  Only after filing the complaint did BSF deliver the other 30 or so boxes of documents to Proskauer. (Mokriski Dec.)

<u>Host Prepares a Motion to Disqualify</u>

Once the complaint in this action was filed, substantive contact between BSF and Proskauer seems to have ceased.  BSF argues that this added unnecessarily to Host's costs.

16

Frankly, I find it perfectly understandable. For over a month, BSF had refused to acknowledge any conflict. It had repeatedly represented to its former client that it had reached that conclusion after diligent investigation. It had gone ahead and filed suit against its former client. Host's conclusion that it would have to move to disqualify BSF was anything but unreasonable.

And so Proskauer prepared the motion to disqualify, in connection with which it did what BSF obviously did not -- carefully and exactingly reviewed all 39 boxes of BSF documents pertaining to its representation of Host in various Marriott related disputes. (Mokriski Decl. ¶¶ 13, 17.)

After completing its motion papers, Proskauer proposed a final meeting with BSF and its outside ethics counsel in a last ditch effort to avoid the need to file that motion. (Mokriski Decl. ¶ 18.) At this meeting, which was held on Friday, February 22, 2013 (a week after Proskauer had requested it), Proskauer outlined its disqualification motion for BSF, supporting its position that BSF had a serious conflict of interest with documents, all but one of which had been obtained from BSF's own files. At the end of the meeting, Proskauer gave BSF until the close of business on the following Monday to withdraw. (*Id.*)

BSF offered no response to Proskauer's presentation -- *except to ask for copies of the documents on which Proskauer had relied,* all but one of which came from BSF's own files. (*Id.*)

<u>Oh, THAT Conflict!</u>

The next day, Saturday, February 23, 2013, Mr. Ross contacted Proskauer by phone and stated that BSF had decided it was conflicted from representing Madison and would immediately take steps to withdraw from that representation -- both in this case and in the related State Court Action, to which Host was not a party. (Mokriski Decl. ¶ 19.)

What changed BSF's and Ross' minds was seeing – and finally understanding the import of – two documents. The first was the May 6, 2002 Memorandum, in which BSF opined that ███ ████████████████████████████████████████████████████████████████████████ The second was a November 26, 2002 letter from Abdoo to a lawyer representing the plaintiff in a class action/derivative suit. In that letter, which was drafted in whole or in part by BSF, Abdoo stated that the renegotiated contracts between Host and Marriott were beneficial to Host. ████ ████████████ utterly inconsistent with Paragraphs 60-66 of the Complaint that was drafted before November 28, 2012 and filed with this court on January 13, 2013. Furthermore,  the May 6 Memorandum was turned over by BSF on January 4, which means that it had been reviewed with "enhanced care" prior to that date. Sadly, a lawyer from a firm that had no connection with BSF's earlier representation had to point out the obvious before anyone from or representing BSF would acknowledge the multi-faceted conflict.

On March 1, 2013, BSF filed a "Notice of Joint Motion to Stay All Proceedings and to Adjourn All Current Scheduled Dates" in which it formally acknowledged the conflict of interest and stated it would immediately withdraw from the representation of Madison.  Additionally, BSF requested a two-week stay in all proceedings in order to allow Madison the opportunity to find substitute counsel.

Demand for Fee Reimbursement

Needless to say, all of this cost Host a pretty penny. So on February 27, 2013, Proskauer informed Mr. Ross that Host expected BSF to reimburse it for the fees and expenses it incurred in having to prepare the motion to disqualify. (Mokriski Decl. ¶ 20.) Mr. Ross did not respond to Host's demand until March 12, when he informed Proskauer that BSF was unwilling to reimburse Host for any portion of those fees. (*Id.*)  He asserted that because BSF had taken steps

18

SPA-46

to withdraw immediately after Host showed it the documents at the February 22 meeting – documents that had ostensibly been reviewed first by BSF lawyers -- BSF bore no responsibility for costs or expenses Host had incurred in connection with the conflicts issue. (*Id.*)

## ARGUMENT

### 1. BSF Was Clearly Disqualified from Undertaking this Matter Adverse to Host

There is no dispute that BSF had a conflict which should have prevented it from ever undertaking to represent Madison in this action. BSF has admitted as much.

In a case of successive representation such as this, a party seeking disqualification must show (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) counsel whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. *See Lott v. Morgan Stanley Dean Witter & Co. Long-Term Disability Plan*, No. 03 Civ. 9235 HB, 2004 WL 2980193, at *1 (S.D.N.Y. Dec. 23, 2004). Successive representation on substantially related matters is the "paradigmatic" case for disqualification, because "the attorney is in a position to use the confidences gained through prior conferences with a former client." *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1083-84 (S.D.N.Y. 1989).

In turn, "Matters are 'substantially related' . . . if they involve the same transaction or legal dispute or if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been

obtained in the prior representation would materially advance the client's position in the subsequent matter." Comment [3] to N.Y. RULE OF PROF. CONDUCT 1.9.

BSF's involvement in negotiating, papering and blessing a settlement that it has now painted as an unlawful racketeering and antitrust conspiracy clearly shows that its recent representation of Madison was substantially related to the firm's prior engagement with Host. The complaint before this court questions the motives behind Host's renewal of the Marriott management agreement and calls it "contrary to Host's self-interest" (Compl. ¶ 65), yet BSF had previously opined that the renewal "provided a meaningful positive benefit to Host." (Abdoo Decl. Ex. 2.) In such circumstances, a law firm must withdraw. *See e.g., Cablevision Lightpath, Inc. v. Verizon New York Inc.*, 11-cv-2457, 2011 U.S. Dist. LEXIS 125587 (E.D.N.Y. Oct. 28, 2011); *Ullrich v. Hearst Corp.*, 809 F. Supp. 229, 238 (S.D.N.Y. 1992).

**2. Host Is Entitled to Attorneys' Fees Incurred to Force BSF's Mandated Withdrawal**

A party seeking to recover attorneys' fees incurred in filing a motion to disqualify may do so under 28 U.S.C. § 1927, which states that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*Id.* The purpose of § 1927 is "'to ensure that those who create unnecessary costs also bear them.'" *O'Rear v. Am. Fam. Life Ass. Co.,* 144 F.R.D. 410, 413 (M.D. Fla. 1992) (citation omitted). In addition, fees may also be recovered under the court's "inherent power to impose attorney's fees 'when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons … [or] if a court finds that a fraud has been practiced upon it.'" *THOIP v. Walt Disney Co.*, No. 08 Civ. 6823 (SAS), 2009 WL 125074, at *4 (S.D.N.Y. Jan. 20, 2009) (citations

20

omitted). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted.) In truth, they "serv[e] the dual purpose of 'vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.'" *Id.* at 46 (citation omitted.)

In the Second Circuit "'the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.'" *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143-144 (2d Cir. 2012) (citation omitted.) *See also THOIP*, 2009 WL 125074, at *4 n.51 ("The standard for awarding fees under section 1927 and the Court's inherent power is the same.") (citation omitted).

Under the circumstances presented here, *Life Fitness, Inc. v. Sears, Roebuck and Co.*, No. 88 C263, 1988 WL 37835 (N.D. Ill. Apr. 21, 1988), is particularly instructive. In that case, the District Court held plaintiff's law firm liable for defendant's attorney's fees pursuant to 28 U.S.C. § 1927 where the firm disregarded several withdrawal demands from the defendant's attorney, insisting that it had fully considered and rejected any conflict, and then voluntarily withdrew from the case after a motion to disqualify was filed. *Id.* at *1. According to the Court, once plaintiff's counsel was informed of the potential conflict, it had "an obligation to investigate the facts and the law." *Id.* at *2. Had the attorneys done so, they could have "saved everyone substantial time and money" by withdrawing without the necessity of a motion. *Id.*

Instead, plaintiff's counsel had "unnecessarily required [defendants] to expend time and effort [of preparing and] filing a motion." *Id.*

The court in *THOIP v. Walt Disney Co.*, also awarded attorney's fees after defense counsel's voluntary withdrawal. 2009 WL 125074, at *4. In *THOIP*, defense counsel had determined that a conflict of interest warranted its withdrawal from the case, but then failed to notify plaintiff of the impending withdrawal until several hours before plaintiff filed its motion to disqualify. *Id.* Since the motion was "substantially finished" by the time of the withdrawal, the court held that plaintiff was entitled to fees under § 1927 and the court's inherent power. *Id.* at *3-4 n.39 & n.51 (citation omitted).

Frankly, BSF's conduct in the instant matter is infinitely more egregious than that of the conflicted counsel in *Life Fitness* and *THOI*.

-- BSF adamantly rejected Host's complaint about the conflict before it had even reviewed its own files relating to the work it had done for Host, files that contained the key documents revealing the conflict.

-- BSF and its outside ethics counsel initially claimed there was no conflict because they had done a search of BSF's electronic files for words and phrases like "collective bargaining" and "union" and nothing turned up, yet among BSF's electronic files were multiple documents that should have been turned up in a keyword search using those terms.

-- After retrieving its Host files (which it did only belatedly and in response to Host's demand for them, not because it thought it had any obligation to review the scope of its prior representation), BSF refused to turn them over until its deputy general counsel and outside ethics counsel could personally review them with "enhanced care." Yet these two experienced lawyers managed to miss the obvious conflict.

22

-- BSF filed the instant complaint while discussions about the possible conflict were in progress, and before the vast majority of its files were turned over to Host.

-- BSF continually represented that it was turning over its files promptly after reviewing them. But as 34 of the 39 boxes that were eventually produced were not turned over until after the complaint was filed, it is incontrovertible that BSF started this lawsuit before anyone at the firm actually bothered to review the vast majority of its relevant files.

Once Host voiced its concern about the conflict, BSF was under an "obligation to investigate the facts and the law." *Life Fitness, Inc.*, 1988 WL 37835, at *2. Indeed, BSF acknowledged this duty. It told Abdoo on December 8, 2012 that it was "analyzing the issue" and undertaking an "investigation." (Abdoo Decl. Ex. 3.) It told Proskauer a month later, on January 10, 2012 (three days before it filed the complaint) that it "had taken, and continue[d] to take Host's "allegations" of a conflict "very seriously" and had given them "top priority." (Mokriski Decl. Ex. 4.) Yet, BSF continued to reject any notion that there was a relationship between the two representations: one advising Host's Board ███████████████████ ███████████████████ the other attacking those very agreements as "inexplicable" and not in Host's best interest.

It was left to Proskauer to put the complaint and ███████████ side by side and point out the obvious: BSFcould not help Madison mount an attack on the *bona fides* of the very settlement that the firm had helped to engineer. BSF's conduct resulted in nothing if not needless and vexatious litigation, to the detriment of its former client. And its failure to examine its own files fully before concluding that there was no conflict – a conclusion from which it refused to back down – was, in the circumstances, unreasonable.

23

BSF argues that it need not reimburse Host for its fees and costs associated with investigating the conflict and preparing the motion to disqualify because it withdrew immediately once Proskauer spelled out exactly what the conflict was. But BSF stands its ethical obligations on their head when it tries to hold its client responsible in these circumstances. BSF had in its possession every piece of information – every document, every datum – needed to ascertain whether a conflict existed. I have outlined above, in great detail, what BSF did and did not do with that information. Proskauer and Host should not have had to physically place the relevant documents under the noses of the lawyers who had purportedly reviewed them with "enhanced care" weeks earlier. The evidence establishes that BSF either failed to undertake an appropriate investigation despite its representations to the contrary, or did so in the most cavalier manner, stringing Host along for weeks, and causing its former client to incur significant expense in trying to secure BSF's acknowledgement of what should have been obvious.

BSF also argues that it should not be charged with discovering the conflict earlier than it did because it was not obvious, but "subtle." I am constrained to disagree; there was nothing subtle about it. Certainly there was nothing subtle about the uncanny coincidence in timing between Host's settlement of what had been a long-running dispute with Marriott and the purported hatching of a conspiracy between the two contending parties. The simultaneity of these two events, without more, should have caused BSF to review its prior work before taking on a new representation adverse to its former client. Once Host cried foul, serious and detailed scrutiny of the prior representation should have been undertaken before filing the complaint that called Host's conduct (including its entry into long-term management agreements that BSF reviewed on behalf of Host's Board) "inexplicable." Serious and detailed scrutiny  meant doing more than (1) conducting what can only have been perfunctory interviews with lawyers about a

matter about which they had not thought for ten years, and (2) rummaging among electronic documents using "keywords" that appear designed to uncover nothing at all. At a minimum BSF had an obligation, before taking a position that there was no conflict, to retrieve and read the critical documents relating to its prior representation -- including specifically any and every document describing the scope of the representation and any and every attorney-client memorandum or opinion letter! As for the document review that did take place: to describe is as incompetent is no overstatement.

BSF was also obligated to think about whether the work it performed on a global settlement of disputes between Host and Marriott might make its lawyers witnesses in a case that challenged the *bona fides* of the two companies' relationship from and after the time that settlement was consummated. There is absolutely no evidence that anyone -- even Mr. Ross the ethics expert -- ever approached the conflicts issue from that angle.

Figuring out the precise contours of BSF's former representation, and its relationship to a conspiracy that was supposedly being hatched at exactly the same moment, did indeed require some connecting of the dots. But BSF purports to employ some of the finest and most sophisticated lawyers in the country. Frankly, the conflict was "subtle" only if one did not particularly want to see it; and from the first day of its "investigation," when Mr. Ross was given a ridiculously unduly narrow description of the scope of the firm's work for Host, until the very end, when BSF had to ask Proskauer for copies of its own damning documents, the evidence suggests to this court that BSF did not want to see it.

BSF suggests that, because Proskauer did not spell out the precise contours of the conflict until February 22, 2013, the basis for the conflict was "speculative." It cites cases from this court which hold that much more than speculation and conclusory allegations are required to

25

disqualify a party's chosen attorney. (BSF Brief in Opposition at 16, n.5) But there is nothing either speculative or conclusory about the facts that Abdoo and Mokriski brought to BSF's attention – and there is nothing speculative in the evidence drawn from BSF's own files. So the cases it cites are entirely beside the point.

The only inference I can draw from the record before me – and it is a compelling inference -- is that BSF would not agree to withdraw until it was faced with the fact that Host was about to file a motion to disqualify on the public record. Because of BSF's adamant denials of a conflict, Host's attorneys were forced to leave no stone unturned in analyzing how a sophisticated law firm with outside ethics counsel could possibly have concluded, after an exhaustive investigation, that no conflict existed. Host was thus forced to incur significant expenses in preparing the motion to disqualify. Host should not be forced to bear this expense simply because BSF ultimately, and belatedly, conceded that it could not avoid the ethical constraint under which it labored.

## Conclusion

Host's motion for sanctions is granted. Host will be awarded full attorneys' fees for all expenses incurred from and after December 18, 2012. That is the date when BSF, for the third time, denied that there was a conflict and refused to stop work on this matter, even though it had neither reviewed its own files nor conducted an investigation into Host's allegations thorough enough to comport with its obligation to its former client.

Host should submit its time records within ten days of this decision.

SPA-54

Dated: October 31, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————x

MADISON 92ND STREET ASSOCIATES, LLC,

        Plaintiff,

   -against-                             13 Civ. 291 (CM)

MARRIOTT INTERNATIONAL, INC., HOST
HOTELS & RESORTS, INC., DIAMONDROCK
HOSPITALITY CO., and the NEW YORK
HOTEL & MOTEL TRADES COUNSEL, AFL-CIO,

        Defendants.

————————————————————————————x

ORDER DENYING MOTION FOR RECONSIDERATION

McMahon, J.:

     Boies, Schiller & Flexner's motion for reconsideration of the court's October 16, 2013
order is DENIED *sua sponte* and without any need for the filing of responsive papers. A fuller
order will be docketed on Monday.

Dated: November 6, 2013

                                            _____
                                              U.S.D.J.

BY ECF TO ALL COUNSEL

SPA-56

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

MADISON 92ND STREET ASSOCIATES, LLC,

        Plaintiff,

   -against-                                                           13 Civ. 291 (CM)

MARRIOTT INTERNATIONAL, INC., HOST
HOTELS & RESORTS, INC., DIAMONDROCK
HOSPITALITY CO., and the NEW YORK
HOTEL & MOTEL TRADES COUNSEL, AFL-CIO,

        Defendants.

_____ x

ORDER DENYING THE MOTION OF BOIES SCHILLER & FLEXNER FOR
RECONSIDERATION OF THE COURT'S OCTOBER 16, 2013 ORDER

McMahon, J.:

     Boies, Schiller & Flexner LLP (BSF), moves for reconsideration of this court's order
dated October 16, 2013, in which I granted a motion for sanctions against the firm filed by its
former client, Defendant Host Hotels & Resorts Inc. – an entity that BSF sued on behalf of a new
client, Madison 92nd Street Associates, LLC, in a blatant conflict of interest.

     Per this court's rules, I have reviewed the motion for reconsideration in order to
determine whether a response is required from Host.

     No response is required. The motion is denied.

     The motion requests that I change or delete two sentences in the order that describe the
incomplete and insufficient information provided to BSF's outside ethics counsel, Michael Ross,
Esq. BSF expresses its "concern" that the language in these two sentences "asserts or implies
that BSF did not fully cooperate or provide available documents or information" to Mr. Ross.
BSF argues that any failure to discover the conflict of interest described at length in this court's
opinion – a conflict BSF finally acknowledged two and a half months after it was called to the
firm's attention – was attributable to Mr. Ross or to Host's ethics counsel, Proskauer Rose -- and
not to BSF.

     It is indeed noble of Mr. Ross to fall on his sword for his former client (he has been
relieved, BSF having decided that it is better equipped to argue its own cause). But I'm not

buying it. Mr. Ross may well have been the one to select the search terms that were used to conduct the wholly inadequate search of BSF's computerized files in order to see whether BSF's representation involved "unions" or "collective bargaining" issues. However, Mr. Ross could only have selected his keywords based on what he was told about the former representation by his client – BSF. I remain unconvinced, and I suspect I cannot be convinced, that BSF could possibly have given Ross a full and fair description of the work the firm performed for Host between 2001-2004. The fact is that the BSF lawyers who were "checking the conflict" were not aware of the scope of work performed by the firm a decade earlier, and they did not bother to obtain correct and complete information by, for example, reviewing the file or carefully interviewing all of the lawyers who performed significant work on the earlier matter.  Mr. Ross only knew what his client told him, so the ultimate responsibility here lies with BSF – even if Mr. Ross selected the computerized search terms that failed to yield the documents that might have revealed the conflict.

If all that occurred here was a sloppy computerized document search conducted by outside counsel – one that, as I pointed out, apparently missed relevant documents containing the words like "union" and "collective bargaining," which were among the search terms that Mr. Ross suggested – there might arguably be some basis for reconsideration. But what happened here was far, far worse. BSF represented to this court that its own lawyers (not its outside counsel) had checked for conflicts carefully and seriously, and that those lawyers could not have discovered the conflict – because it was "subtle." Well, it was not subtle at all – in fact, if you were looking for it, there was NOTHING subtle about this conflict. And the responsibility for unearthing it rested squarely on the shoulders of BSF – not its outside counsel, not its former client, and certainly not Proskauer. The documents that revealed it were culled from BSF's own files, and BSF has represented to this court that its own lawyers painstakingly reviewed those files (albeit long after it undertook the conflicting representation). Any competent lawyer should have been able to see what was obvious.

The motion for reconsideration is denied. The sanction must be paid within ten days. Fortunately for BSF, it will not have to be increased by any cost associated with responding to this meritless motion.

Dated: November 6, 2013

_____

U.S.D.J.

BY EMAIL TO ALL COUNSEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————x

MADISON 92ND STREET ASSOCIATES, LLC,

        Plaintiff,

   -against-                          13 Civ. 291 (CM)

COURTYARD MANAGEMENT CORPORATION,
Et al.,

        Defendant.

————————————————————————————x

ORDER AWARDING SANCTIONS

McMahon, J.:

     I have reviewed the statement of fees and costs incurred by Defendant Host in connection with its efforts to cause Boies Schiller & Flexner to recognize the conflict of interest that the firm had in connection with its representation of plaintiff in this matter.

     As I indicated in a memo endorsement some months ago, the amount of lawyer time and client money expended on the conflict representation is, in a word, excessive – although I recognize that part of the excess was occasioned by Boies Schiller's intransigence.

     Host seeks a sanction of $397,460 in legal fees and $14,883.90 in disbursements, the lion's share of which (nearly $13,000) consists of computerized legal research fees.

     I believe that this matter could easily have been handled by Senior Counsel Jordan Leader and Associate Boris Zeldin with some modest partner input otherwise than from Charles Mokriski, Proskauer's in house "professional responsibility" counsel, whose time the firm is absorbing as a cost of doing business. I am, therefore, allowing the entirely of Mr. Leader's and Mr. Zeldin's fees (a total of $215,616.25), plus one quarter of the partner time ($45,764), and the paralegal time ($7,766.25). I have no idea what "litigation support staff" is; paralegals are litigation support staff.  The total amount of the legal fees sanction is $269,146.50. The total amount of allowable disbursement is $1,916.71. The total sanction is $271,063.21. The Clerk of the Court shall enter judgment, which is payable in ten days; Host shall have execution therefor.

Dated: August 8, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
MADISON 92nd STREET ASSOCIATES LLC,

                        Plaintiff,

      -against-

COURTYARD MANAGEMENT
CORPORATION, Et al.,

                        Defendant.

-------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 8/11/2014

13 **CIVIL** 291 (CM)

**SUPPLEMENTAL**
**JUDGMENT**

      Whereas Defendant Host having moved seeking a sanction of $397,460 in legal fees and $14,883.90 in disbursements, the lion's share of which (nearly $13,000) consists of computerized legal research fees, and the matter having come before the Honorable Colleen McMahon, United States District Judge, and the Court, on August 8, 2014, having rendered its Order allowing the entirely of Mr. Leader's and Mr. Zeldin's fees ($215,616.25), plus one quarter of the partners time ($45,764), and the paralegal time ($7,766.25), the total amount of the legal fees sanction is $269,146.50, the total amount of disbursement is $1,916.71, the total sanction is $271,063.21, the Clerk of the Court is directed to enter judgment, which is payable in 10 days; Host shall have execution therefor, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Order dated August 8, 2014, judgment is hereby entered in the amount of $271,063.21, which is payable in 10 days; Hosts shall have execution therefore.

**Dated:** New York, New York
        August 11, 2014

                                  **RUBY J. KRAJICK**

                                  **Clerk of Court**

               BY:

                                  **Deputy Clerk**

                    **THIS DOCUMENT WAS ENTERED**
                    **ON THE DOCKET ON** _____

## 28 U.S.C. § 1927

"Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."